**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NEIL ABROMAVAGE,

                                   Plaintiff,

          v.

DEUTSCHE BANK SECURITIES INC.; JEFFREY
BUNZEL, in his official and individual capacities; and
MARK HANTHO, in his official and
individual capacities,

                                   Defendants.

Case No.:

**COMPLAINT**

Jury Trial Demanded

          Plaintiff, Neil Abromavage ("Plaintiff" or "Mr. Abromavage") by and through his

undersigned counsel, Goodstadt Law Group, PLLC, as and for his Complaint in this action

against Deutsche Bank Securities Inc. (referred to either as "DB," "Deutsche Bank," or the

"Bank"), Jeffrey Bunzel ("Bunzel") and Mark Hantho ("Hantho," and together with DB and

Bunzel, "Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

          1.       This is an action for declaratory, injunctive and equitable relief, as well as

monetary damages, to redress Defendants' willful and malicious violations of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York State Human

Rights Law, N.Y. Exec. Law §§ 290, *et seq.* (the "NYSHRL") and the New York City Human

Rights Law, New York City Administrative Code §§ 8-101, *et seq.* (the "NYCHRL"), by

retaliating against Plaintiff after he participated, provided information and assisted in an

investigation into allegations of discriminatory misconduct by another former Managing Director

at the Bank, Jason Gurandiano, an investment banker covering FinTech, as well as Mr.

Abromavage's subsequent complaints about such unlawful retaliation by Defendants.

2.      Indeed, almost immediately after Mr. Abromavage's participation and assistance in the investigation – which led the termination of Mr. Gurandiano's employment with the Bank –Defendants began to engage in a concerted pattern of retaliation that not only adversely affected Mr. Abromavage's compensation and standing at the Bank, but also permanently damaged his career in the financial services industry.

3.      And, after Mr. Abromavage had the courage to complain about his supervisors' unlawful retaliation, the retaliation worsened, culminating in the unlawful termination of Mr. Abromavage's long-term employment with the Bank.

4.      Defendants' misconduct was knowing, malicious, willful and wanton and/or showed a reckless disregard for Mr. Abromavage, which has caused and continues to cause him to suffer substantial economic and non-economic damages, and permanent harm to his professional and personal reputations.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA and ERISA.  Further, the Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PROCEDURAL REQUIREMENTS

7.      On or about May 1, 2017, Mr. Abromavage filed a charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging violations

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII").  The

Charge arises out of the same facts alleged herein.

8.      On or about April 27, 2018, Mr. Abromavage received his Notice of Right to Sue

from the EEOC (dated April 25, 2018) to pursue this matter in Federal District Court.  This

action originally was filed within 90 days of Mr. Abromavage's receipt of his Notice of Right to

Sue from the EEOC.

9.      Following the commencement of this action, a copy of this Complaint will be

served on the New York City Commission on Human Rights and the Office of the Corporation

Counsel of the City of New York, thereby satisfying the notice requirement of § 8-502 of the

New York City Administrative Code.

10.     Any and all additional prerequisites to the filing of this suit have been met.

## PARTIES

11.     Plaintiff Neil Abromavage is a former employee of Defendants and resides in

New York, New York. Mr. Abromavage was hired by the Bank in or around October 2000. At

all relevant times, Mr. Abromavage worked in New York City and met the definition of an

"employee" under all applicable statutes throughout his employment with Defendants.

12.     Defendant Deutsche Bank Securities Inc. is an indirect wholly owned subsidiary

of Deutsche Bank AG, with its principal place of business located at 60 Wall Street, New York,

New York 10005.  The Bank is a self-proclaimed leading provider of financial services to

agencies, corporations, governments, private individuals and institutions in the Americas.  At all

times relevant herein, Defendant Deutsche Bank was and is an "employer" under all relevant

statutes.

13.     Defendant Jeffrey Bunzel is a Managing Director, Head of Equity Capital Markets at Defendant Deutsche Bank, who resides in New York, New York.  At all relevant times herein, Defendant Bunzel directly participated in the retaliatory and otherwise unlawful employment decisions and actions taken against Plaintiff, and was an "employer" under all relevant statutes.

14.     Defendant Mark Hantho is the Chairman of Global Capital Markets & Chairman of Defendant Deutsche Bank Securities Inc., who resides in New York, New York.  At all relevant times herein, Defendant Hantho directly participated in the retaliatory and otherwise unlawful employment decisions and actions taken against Plaintiff, and was an "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### Mr. Abromavage's Employment at the Bank

15.     Mr. Abromavage began his career with DB in or around October 2000 as an Associate Equity Analyst, after several years working in a similar capacity at another investment bank.

16.     During his tenure with the Bank, Mr. Abromavage consistently outperformed expectations, especially over the last 10 years of his career in Equity Capital Markets ("ECM"), as evidenced by his stellar performance evaluations, as well as his compensation trajectory and career path.

17.     In recognition of Mr. Abromavage's outstanding performance at the Bank, he was promoted multiple times, most recently to Managing Director, Head of the Financial Institutions Group ("FIG") in ECM.

18.     Notwithstanding Mr. Abromavage's documented exceeding-expectations performance, everything changed after he participated, provided information and assisted in an investigation into allegations of discriminatory misconduct by another Managing Director at the Bank, Jason Gurandiano, an investment banker covering FinTech.

19.     Specifically, at the Bank's request, on or about May 19, 2015, Mr. Abromavage participated in the Bank's purported "investigation" into Mr. Gurandiano's discriminatory misconduct by, among other things, meeting with Joanne Smith, Vice President, Employee Relations, and Christina Berti, Director & Associate General Counsel, for nearly 75 minutes regarding Mr. Gurandiano's discriminatory misconduct.

20.     During that meeting, Mr. Abromavage answered that, among other things, he personally witnessed Mr. Gurandiano make multiple egregious racist and otherwise discriminatory comments regarding South Asian-American employees of the Bank, including, but not limited to, referring to them as "slum dog millionaires" and "Indian rug merchants."

21.     Based on this "investigation," Mr. Gurandiano was terminated on or about July 27, 2015.

22.     Notwithstanding Human Resources "guaranteeing" that Mr. Abromavage would not be the victim of retaliation due to his participation in the investigation, his direct supervisors, Defendant Bunzel and Defendant Hantho, almost immediately began a concerted effort to retaliate against Mr. Abromavage for his participation in the investigation that led to Mr. Gurandiano's termination.

23.     This did not surprise Mr. Abromavage in light of Defendants Bunzel's and Hantho's long-term friendship with Mr. Gurandiano (including Messrs. Hantho and Gurandiano both being from Montreal), as well as their documented history of protecting Mr. Gurandiano –

over Mr. Abromavage – within the workplace.  In fact, Messrs. Hantho and Gurandiano, along with another banker from Canada, were internally referred to as the "Canadian Mafia" because they supported each other, and even served to perpetuate Mr. Gurandiano's inappropriate misconduct.

24.     Additionally, Defendants Bunzel & Hantho maintained a close alignment with John Eydenberg, Managing Director, North American Executive Committee Member and Co-Head of Corporate Finance (Sponsors, Technology and FinTech).  Similar to Defendants Bunzel & Hantho, Mr. Eydenberg also had a long-documented and well-known history (internally, and to a degree, externally) of protecting Mr. Gurandiano.

25.     By way of example only, in or around November 2014, Defendants Bunzel and Hantho backed Mr. Gurandiano in connection with his baseless accusations against Mr. Abromavage regarding an initial public offering ("IPO") pitch involving Black Knight Financial Services, as well as a materially false allegation that Mr. Abromavage went behind Mr. Gurandiano's back to pitch a trade in February 2015 involving Social Finance, Inc. ("SoFi").

26.     Defendants Bunzel and Hantho took Mr. Gurandiano's side on the SoFi matter, notwithstanding the fact that Mr. Abromavage conclusively demonstrated that he did not attend the pitch meeting, had no involvement in the pitch, and did not even know about the meeting until three or four weeks after it occurred when Mr. Gurandiano falsely accused him of wrongdoing.

27.     Indeed, Mr. Abromavage was at Princeton conducting DB recruiting on the date of the SoFi meeting.

**Defendants Retaliate Against Mr. Abromavage For Participating In The "Investigation"**

28.     Almost immediately following Mr. Abromavage's participation in the investigation, his business footprint was minimized by Defendants Bunzel and Hantho, as they funneled opportunities away from Mr. Abromavage and his team in a concerted effort aimed to undermine his ability to succeed, particularly during a period in which procuring FIG ECM revenue was extremely competitive.

29.     By way of example only, in or around late May/early June 2015, without explanation or business justification, Defendant Bunzel reassigned a thriving portion of the Banks's permanent capital business away from Mr. Abromavage, his then long-time business partner and his team, and despite a long historical track record of successfully prosecuting this business with Mr. Abromavage's FIG banking team.

30.     Similarly, in or around late September/early October 2015, in a further retaliatory effort to diminish Mr. Abromavage's role at the Bank, Defendants Bunzel did not advise Mr. Abromavage of, and purposefully excluded him from, a particular pitch to Apollo Management as a potential sponsor of another permanent capital vehicle, specifically a SPAC structure.

31.     Indeed, prior to this time, Mr. Abromavage and his then long-time business partner had been integrally involved in the Bank's permanent capital business, including SPACs, and historically had client coverage of Apollo Management and all of its publicly traded permanent capital vehicles.

32.     It was clear that Mr. Abromavage purposely was excluded from this meeting, and was even reprimanded by Defendant Bunzel when he attended the meeting at the behest of the coverage banker (the FIG banker who heads DB's permanent capital business) who wanted Mr. Abromavage at the meeting for his extensive knowledge of the Permanent Capital/SPAC

products, his coverage continuity across other Apollo public permanent capital vehicles and his relationship with Apollo Management.

33.     Defendant Bunzel's decision to strip Mr. Abromavage of his duties not only undermined his visibility both inside and outside of the Bank, but also resulted in a quantitative reduction in Mr. Abromavage's ability to generate revenues, as the Permanent Capital/SPAC business was one of the few performing areas of the Bank in 2015 and 2016.

34.     In addition, almost immediately after Mr. Gurandiano's termination in July 2015, Defendant Hantho ended all conversations with Mr. Abromavage about the possibility of moving to the Bank's FIG investment banking coverage effort, including FinTech, an expanding business in which Mr. Abromavage was experienced and particularly well suited to run.

35.     This decision was clearly retaliatory because Mr. Abromavage's potential move to FIG/FinTech coverage contemplated in May/June/July 2015 made even more sense after the termination of Mr. Gurandiano and another FIG investment banker covering Permanent Capital/SPACs in late July 2015.

36.     In or around June 2015, as part of the conversations about Mr. Abromavage potentially moving from FIG ECM to FIG/FinTech Coverage, he met with Mr. Eydenberg about the potential coverage role and plan with the FIG coverage.  After Mr. Abromavage's participation in the investigation regarding Mr. Gurandiano's unlawful discriminatory misconduct, however, Mr. Eydenberg began ignoring Mr. Abromavage's emails and calls to continue the prior conversations.

37.     This was not surprising in light of the fact that Mr. Eydenberg appeared to function as Mr. Gurandiano's enforcer internally.  Upon information and belief, Mr. Eydenberg explicitly told Mr. Abromavage's then business partner that he "know[s] everything," and even

accused Mr. Abromavage's business partner of not being a "team player" because he did not support Mr. Gurandiano during the investigation.

38.     And, upon information and belief, bankers who reported to Mr. Eydenberg provided substantive recommendations for Mr. Gurandiano to Royal Bank of Canada, Mr. Gurandiano's current employer, in violation of Deutsche Bank's own internal policies.  Rather than disciplining Mr. Eydenberg (or any of the bankers reporting to him), the Bank condoned his conduct and even promoted him in or around November 2015 to Vice Chairman, Corporate and Investment Banking Americas, notwithstanding his retaliation towards Mr. Abromavage and ardent support of Mr. Gurandiano.

39.     Moreover, Defendants Bunzel and Hantho began to send Mr. Abromavage increasingly aggressive emails and began to further marginalize his role and involvement in specific insurance and asset management situations.

**Defendants Increase Retaliation After Mr. Abromavage Complains To Human Resources**

40.     In response to Defendants' blatant mistreatment of Mr. Abromavage, he frequently complained to Mmes. Berti and Smith, as well as other members of the Bank's Human Resources team, regarding Defendants Hantho's and Bunzel's unlawful retaliation against him.

41.     By way of example only, on or about August 10, 2015, at Mr. Abromavage's request, he met with Ms. Smith (Ms. Berti was on vacation) regarding the deterioration of his role and relationship with Defendants Bunzel and Hantho, and explained that Mr. Gurandiano's termination exacerbated the issues given Mr. Gurandiano's close relationship with Defendants Bunzel and Hantho and their history of protecting Mr. Gurandiano in favor of Mr. Abromavage.

42.     In response, Ms. Smith again promised that Mr. Abromavage would not be subjected to further retaliation, and even provided Mr. Abromavage with a copy of the Bank's purported anti-retaliation policy.

43.     Notwithstanding these further assurances, the retaliation did not end.

44.     Indeed, shortly after Mr. Abromavage complained about the retaliation, he was purposefully excluded from an IPO pitch in New York City, an important pitch to an important company in the financial payments sector that he historically would have attended.

45.     In addition, Defendants Bunzel and Hantho prevented Mr. Abromavage from attending DB's annual Technology/FinTech Conference in Las Vegas, which was inconsistent with his historical participation in these types of conferences prior to his participation in the investigation and complaints about retaliation being directed towards him by Defendants Bunzel and Hantho.

46.     The Bank's 2015 Technology Conference, where more than 100 other DB professionals were permitted to attend, included numerous public and private FinTech companies on Mr. Abromavage's coverage list, and his absence further damaged his reputation and standing both internally at the Bank and externally with clients and potential clients.

47.     In response to this continued retaliation, on or about October 20, 2015, Mr. Abromavage again met with Ms. Berti and Michele Kershenbaum, Vice President, Employee Relations.

48.     At that meeting, Mr. Abromavage explained that the senior executives who sat on the North American Executive Committee, who had direct authority over the terms and conditions of his employment, and who were in charge of his compensation, internal mobility and career progression, continued in their persistence to undermine his role and performance by

excluding him from important client meetings, and damaging his relationships both internally and externally.

49.     Specifically, Mr. Abromavage complained that this retaliatory behavior, which resulted in a substantially deteriorated role, was in response to his participation in the May 2015 investigation of Mr. Gurandiano's discriminatory misconduct.

50.     It is clear that the Bank did not take Mr. Abromavage's complaints seriously, as no remedial action was taken to cure the retaliatory misconduct of Defendants Hantho or Bunzel, or that of Mr. Eydenberg.

51.     To the contrary, the retaliation continued, as Mr. Abromavage continued to be excluded from important client pitches and meetings, which further undermined his ability to continue to succeed at the Bank, and despite Managing Director departures in FIG and FinTech coverage, Mr. Abromavage was no longer in the consideration set.  This was a drastic adverse change relative to what was offered to Mr. Abromavage prior to his participation in the Bank's investigation of Mr. Gurandiano's misconduct, which included Mr. Abromavage moving to FIG Coverage from FIG ECM.

52.     On at least five separate occasions, Mr. Abromavage met and/or spoke with members of the Bank's Human Resources and/or legal teams where he complained about the continued retaliation by the senior members of the Firm and his group who sat on the North American Executive Committee, all of whom had direct authority over Mr. Abromavage's terms of employment, his internal mobility and his compensation.

53.     These complaints fell on deaf ears.

54.     Instead, rather than alleviating the unlawful retaliation, the treatment worsened and began to damage the prospects for Mr. Abromavage's bonus compensation.

**Defendants Retaliate Against Mr. Abromavage By Paying Him Zero Bonus For 2015**

55.     On February 10, 2016, Defendant Hantho informed Mr. Abromavage that despite his excellent performance in an extremely challenging 2015, where he generated nearly $20,000,000 in revenues for the Bank, Mr. Abromavage would receive zero bonus, which had never happened to Mr. Abromavage during his prior 14 years with the Bank.

56.     Defendants Bunzel and Hantho personally made the decision to "zero out" Mr. Abromavage for 2015 in retaliation for his participation in the investigation and his subsequent complaints to Human Resources and the legal department about their unlawful retaliation.

57.     Indeed, during this meeting, Defendant Hantho admitted to Mr. Abromavage that he "ha[d] been tortured by [the] Firm . . . by the things that you've gone through."

58.     Standing alone, this admission that Mr. Abromavage was "tortured" by DB over the prior year demonstrates the willful, wanton and knowing misconduct by senior executives at the Bank in response to Mr. Abromavage's participation in the investigation of Mr. Gurandiano's discriminatory misconduct.

59.     Defendant Hantho then explained to Mr. Abromavage that he would "never fire [Mr. Abromavage]" and that Mr. Abromavage "would be the guy," and would not "in any way" be "marked" at zero for compensation decisions for 2016 and in the future.

60.     During that meeting, Defendant Hantho also said that he "needed to know by March 2, 2016" whether or not Mr. Abromavage wanted to stay, while also falsely claiming that he "wanted [Mr. Abromavage] to stay."

61.     In addition, Defendant Hantho recognized that Mr. Abromavage already was "fixing everything" that was perceived as wrong in the wake of the late 2015 departure of Mr. Abromavage's long-time business partner.

62.     Moreover, in a follow-up conversation on February 22, 2016, Defendant Hantho falsely promised Mr. Abromavage that he would be the "CEO of DB FIG ECM," and that Mr. Abromavage would be able to run the business.

63.     These promises were patently false and clearly designed to motivate Mr. Abromavage to generate revenues for the Bank while Defendants Bunzel and Hantho planned the termination of Mr. Abromavage's employment.

**Defendants Unlawfully Terminate Mr. Abromavage's Employment**

64.     On August 4, 2016 (only a few months later), Defendant Hantho and Melissa Fridman, Director, Human Resources, without notice, communicated to Mr. Abromavage that he was being summarily terminated from DB, after nearly 16 years of unparalleled service to the Bank.

65.     Indeed, Defendant Hantho only stated that the Bank allegedly was "downsizing" the group, and that the Bank was going to "adjust the model."

66.     This explanation not only directly contradicted Defendant Hantho's numerous assurances that Mr. Abromavage was going to be the "CEO" of the FIG ECM group, but it was a clear pretext designed to mask the real reasons for Mr. Abromavage's termination – his participation in the investigation of unlawful discrimination that led to Mr. Gurandiano's termination of employment and his subsequent complaints about Defendants Hantho's and Bunzel's unlawful retaliation.

67.     Indeed, Defendant Hantho refused to discuss how he and Defendant Bunzel selected Mr. Abromavage for termination, instead telling Mr. Abromavage such discussion was "for another time."

68.     The timing of this termination was especially surprising in light of the fact that Mr. Abromavage closed a deal the night before that resulted in approximately $1,700,000 in revenues to the Bank.

69.     It is clear that Defendants Bunzel's and Hantho's retaliatory animus motivated Mr. Abromavage's termination, as Defendants cannot possibly provide any legitimate business justification for selecting Mr. Abromavage – the only Managing Director in ECM selected for termination – over the 15 other Managing Directors who were not terminated, many of whom were aligned with Defendants Bunzel and Hantho.

70.     In fact, Mr. Abromavage was one of the top revenue producing Managing Directors in ECM, individually generating approximately $380,000,000 for the Bank since 2010 (and a total of $616,000,000 during that same period in the aggregate with his former business partner).

71.     These revenues generated by Mr. Abromavage eclipse almost every other Managing Director in the group who was not selected for termination.

72.     And, in 2016, despite the retaliatory significant reduction in Mr. Abromavage's role/footprint, he was responsible for individually generating significant qualitative revenue and mandates for the Bank, notwithstanding the fact that Defendant Bunzel had stripped Mr. Abromavage of his lucrative Permanent Capital/SPAC coverage, as well as coverage of parts of the Specialty Finance and FinTech subsectors in FIG ECM.

**Defendants Continue to Retaliate Against Mr. Abromavage After His Termination**

73.     The unlawful retaliation against Mr. Abromavage did not end with his retaliatory termination of employment.

74.     Specifically, the media almost immediately reported on Mr. Abromavage's sudden termination, citing "sources" within the Bank.

75.     This leak of information to the press further damaged Mr. Abromavage's professional and personal reputations, and prospects for securing subsequent employment within the financial services industry.

76.     Defendants' unlawful misconduct was intentional, done with malice and/or showed a deliberate, willful and wanton disregard for Mr. Abromavage and his civil rights in violation of Federal, New York State and New York City human rights laws.

77.     As a result of Defendants' unlawful retaliation, including, but not limited to, paying zero bonus for 2015 and ultimately terminating Mr. Abromavage's employment, he has suffered, and continues to suffer, monetary and/or economic damages, including but not limited to, loss of past and future income, compensation and benefits.

78.     Mr. Abromavage also has suffered irreparable damage to his reputation and career.

79.     As a result of the foregoing unlawful retaliatory acts, Mr. Abromavage also has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering.

## **FIRST CAUSE OF ACTION**
### **(Retaliation Against Defendant Deutsche Bank in Violation of Title VII)**

80.    Plaintiff hereby alleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

81.    By the actions described above, Defendant Deutsche Bank retaliated against Plaintiff in violation of Title VII by subjecting him to adverse personnel actions, compensation decisions and the termination of his employment in retaliation for his participation in an investigation into unlawful discrimination, and his subsequent complaints about unlawful retaliation, which Plaintiff believed in good faith represented a violation of law.

82.    As a direct and proximate result of Defendant Deutsche Bank's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of damages and other relief.

83.    As a direct and proximate result of Defendant Deutsche Bank's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

84.    Defendant Deutsche Bank's unlawful retaliatory conduct in violation of Title VII was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiff's civil rights, entitling him to an award of punitive damages.

## SECOND CAUSE OF ACTION
**(Retaliation Against All Defendants in Violation of NYSHRL)**

85.     Plaintiff hereby alleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

86.     By the actions described above, Defendants retaliated against Plaintiff in violation of NYSHRL by subjecting him to adverse personnel actions, compensation decisions and the termination of his employment in retaliation for his participation in an investigation into unlawful discrimination, and his subsequent complaints about unlawful retaliation, which Plaintiff believed in good faith represented a violation of law.

87.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of damages and other relief.

88.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
**(Retaliation Against All Defendants in Violation of NYCHRL)**

89.     Plaintiff hereby alleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

90.     By the actions described above, Defendants retaliated against Plaintiff in violation of NYCHRL by subjecting him to adverse personnel actions, compensation decisions and the

termination of his employment in retaliation for his participation in an investigation into unlawful discrimination, and his subsequent complaints about unlawful retaliation, which Plaintiff believed in good faith represented a violation of law.

91.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which he is entitled to an award of damages and other relief.

92.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

93.     Defendants' unlawful retaliatory conduct in violation of NCHRL was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiff's civil rights, entitling him to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Aiding And Abetting Violations of NYSHRL Against Defendants Bunzel And Hantho)

94.     Plaintiff hereby allege and incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

95.     Defendants Bunzel and Hantho knowingly and recklessly aided and abetted the unlawful employment practices and/or unlawful retaliation against Plaintiff in violation of NYSHRL.

96.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief against Defendants Bunzel and Hantho in their official and individual capacities.

97.     As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief against Defendants Bunzel and Hantho in their official and individual capacities.

## FIFTH CAUSE OF ACTION
### (Aiding And Abetting Violations of NYCHRL Against Defendants Bunzel And Hantho)

98.     Plaintiff hereby alleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

99.     Defendants Bunzel and Hantho knowingly and recklessly aided and abetted the unlawful employment practices and/or unlawful retaliation against Plaintiff in violation of NYCHRL.

100.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief against Defendants Bunzel and Hantho in their official and individual capacities.

101.     As a direct and proximate result, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief against Defendants Bunzel and Hantho in their official and individual capacities.

102.    Defendants Bunzel's and Hantho's unlawful retaliatory conduct in violation of NCHRL was willful, wanton, outrageous and malicious, and was done with conscious disregard of Plaintiff's civil rights, entitling him to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violated the laws of the United States, the State of New York and City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An order directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' unlawful retaliatory treatment of him, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Plaintiff;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic hardship, including, but not limited to, the loss of past and future income, wages, compensation, and other benefits of employment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory harm, including, but not limited to, compensation for his severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and any other physical or mental injuries;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

G.      An award of punitive damages under Title VII and the NYCHRL;

H.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: July 23, 2018
New York, New York

Respectfully submitted,
**GOODSTADT LAW GROUP, PLLC**

By: _____

Andrew S. Goodstadt
George D. Vallas
520 Eighth Avenue, 14th Floor
New York, New York  10018
Telephone: (646) 430-8295
agoodstadt@goodstadtlaw.com
gvallas@goodstadtlaw.com

*Attorneys for Plaintiff*