## <u>EXHIBIT 1</u>

Selections from the Deposition of Christina Berti, Esq. dated July 26, 2019

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------------X

5  NEIL ABROMAVAGE,

6                    Plaintiff,

7       -against-                   Case No.

                                    1:18-cv-06621-VEC

8  DEUTSCHE BANK SECURITIES

9  INC.; JEFFREY BUNZEL, in his

10  official and individual capacities;

11  and MARK HANTHO, in his

12  official and individual capacities.,

13                    Defendants.

14  ------------------------------------X

15

16          * * C O N F I D E N T I A L * *

17

18          DEPOSITION OF CHRISTINA BERTI

19               New York, New York

20               July 26, 2019

21

22

23

24  JOB NO. 165167

25  Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR

1                    C. Berti

2        A.    I don't know how things changed.  I

3    know that he reported to us that he felt that

4    things have changed.

5        Q.    How did he report to you things

6    have changed?

7        A.    How?  In our meeting.  He described

8    what he considered to be change.

9        Q.    What I meant to say is, in what way

10    had things changed according to his

11    description?

12        A.    He said he felt that he had been

13    excluded from certain meetings and activities

14    related to the business.

15        Q.    Were you aware that -- withdrawn.

16            Did Mr. Abromavage tell you that he

17    had been in discussions to move to a

18    different group?

19        A.    I don't recall.

20        Q.    What group did Mr. Abromavage work

21    at?

22        A.    He worked in ECM.

23        Q.    Were you ever aware that he had

24    been in discussions to move to a covered role

25    in the financial institutions group, the FIG

1       C. Berti

2    group?

3       A.    I don't recall which group but that

4    he was considering other positions, but I

5    don't recall which they were specifically.

6       Q.    Do you recall Mr. Abromavage

7    telling you that the discussions ceased

8    following Mr. Gurandiano's termination?

9       A.    Which discussions?

10      Q.    About his move to a different

11   position.

12      A.    I don't recall.

13      Q.    Did Mr. Gurandiano -- withdrawn.

14            Did Mr. Abromavage explain how

15   he -- why he thought other people were aware

16   that he had participated in the investigation

17   into Mr. Gurandiano?

18      A.    Yes.  I believe he said he thought

19   other people were aware.

20      Q.    Did he say who he thought was

21   aware?

22      A.    I don't recall if he named anyone

23   specifically.

24      Q.    Was it concerning to you that other

25   people would be aware of his participation in

1                      C. Berti

2      A.    Because it came up in our meeting.

3      Q.    In what -- in what context did it

4  come up?

5      A.    Can I read the document for a

6  second --

7      Q.    Of course.

8      A.    -- around that?

9            (Pause.)

10           Can you repeat your question.

11           MR. VALLAS:  Can you read back the

12      question.

13           (Record read.)

14      Q.    In what context did the reference

15  to "FIG IB" come up?

16      A.    It appears it's part of a statement

17  that "meetings getting set up, part of team

18  to be included and then not," and then it

19  states, "FIG investment banking team."

20  Perhaps that was the team that is being

21  described as part of -- "team" being the

22  investment banking team.

23      Q.    Was Mr. Abromavage describing a

24  potential move to FIG investment banking?

25      A.    I don't know.

1                    C. Berti

2      Q.    You took these notes; right?

3      A.    Yes.

4      Q.    Is there anything else that would

5   refresh your recollection as to what that is

6   a reference to?

7      A.    Perhaps if I read further into the

8   document, that might help.

9           (Pause.)

10     A.    Reading the document refreshes my

11  recollection that he was concerned that he

12  had been part of meetings or a team to be

13  included in meetings, and then he stated the

14  "not involving FIG investment banking."

15     Q.    Was that involving a move from ECM

16  to FIG investment banking?

17     A.    I don't know.

18     Q.    Turn to the next page.  In the

19  middle, it says -- not in the middle, toward

20  the top.  "Partner co-running ECM is JM.

21  Never spoken about it.  Returned for meeting

22  where JM reprimanded by senior person in

23  management.  JM didn't say who it was."

24           Did I read that correctly?

25           MR. SMITH:  "For" or "from"?

1                    C. Berti

2    significant number to be aware of, and we did

3    not have any names associated with that, so

4    that was something that I wanted to note.

5         Q.    "Given who was let go, have

6    friendship with either other and aligned with

7    JG."  Is that a reference to the four with

8    influence?

9         A.    I don't know.

10        Q.    Well, you took these notes; right?

11        A.    I did.

12        Q.    And you don't remember what -- what

13   this meant?

14        A.    No.

15        Q.    If you look on 2556, the next page.

16   It says, "Didn't tell anyone he participated

17   and they didn't approach him.  I may have

18   deleted HR invite (half dozen admins and

19   junior staff) in time before anyone saw re:

20   JG investigation."

21              Can you explain what that means?

22        A.    Mr. Abromavage was stating this to

23   us.  I don't -- I don't -- I don't know what

24   your question is, what does this mean.

25   Mr. Abromavage was stating to us what I

1           C. Berti

2    recorded here.

3        Q.    Did you ask him what he meant by

4    that?

5        A.    I don't recall.

6        Q.    Was Mr. Abromavage concerned

7    because a half dozen admins and junior staff

8    were able to view his shared calendar where

9    HR invites appeared?

10            MR. SMITH:  Objection.

11       A.    I don't know.

12       Q.    When you write something down in

13   your notes that you are not -- you don't know

14   what it means?  Do you not know what it

15   means, sitting here today?

16       A.    At the time, I probably would have

17   known how this information was elicited and

18   pertained --

19       Q.    You can't remember now?

20       A.    I can't remember now what

21   specifically we were discussing or asking

22   about at that point in time.

23       Q.    This is a problem we have run into

24   a few times, though, where you don't know

25   what your notes mean.

1          C. Berti

2          MR. SMITH:  Is that a question?

3          MR. VALLAS:  It's an observation.

4     It does not call for an answer.

5     Q.    A few lines lower:  "A couple of

6 departures.  One tech (prior FIG), one FIG."

7          Do you know who these couple of

8 departures are referring to?

9     A.    No.

10    Q.    "One tech (prior FIG)."  Did

11 Mr. Gurandiano work in FinTech?

12          MR. SMITH:  Objection.

13    A.    I believe he did.

14    Q.    Could this be a reference to

15 Mr. Gurandiano?

16          MR. SMITH:  Objection.

17    A.    I don't know.

18    Q.    Did you know at the time?

19          MR. SMITH:  Objection.

20    A.    I don't know.  There are no names

21 here, so I can't -- I can't establish that.

22    Q.    "One FIG," is that a reference to

23 Niron Stabinsky?

24          MR. SMITH:  Objection.

25    A.    I don't know.

1                    C. Berti

2    standard practice.  I'm saying, specifically

3    with reference to this complaint, do you

4    remember what you did then?

5        A.    No.

6        Q.    Did you decide to take -- to

7    interview employees about this complaint?

8        A.    Yes.

9        Q.    How did you decide who to

10   interview?

11       A.    We determined who night have

12   information that was relevant.

13       Q.    How did you make that

14   determination?

15       A.    By reviewing our notes of the

16   meeting and the information Mr. Abromavage

17   gave us.

18       Q.    Did you review any documents other

19   than your notes?

20       A.    I don't recall.

21       Q.    Who did you decide to interview?

22       A.    We interviewed Jeff Mortara and

23   Mark Hantho, Jeff Bunzel, John Eydenberg.

24            I don't remember if that was

25   everyone.

1                          C. Berti

2    the first third of the page, it says,

3    "Surprised that when JG said he had 65-pp

4    lawsuit.  JG prep'ing case v DB long time,

5    aware of issue."

6              What is that a reference to?

7        A.    Something that Mr. Mortara told us

8    in the interview.

9        Q.    Do you know what he was referring

10   to?

11       A.    No.

12       Q.    Did you ask him?

13       A.    I don't recall.

14       Q.    Down at the -- halfway through the

15   page on the left-hand margin, it says "JE,"

16   and then next to it, there's a quote, "You

17   should assume I know all that's being said,"

18   close quote.

19              Is that a quote that Mr. Mortara

20   was attributing to John Eydenberg?

21       A.    I am not sure.

22       Q.    What aren't you sure about?

23       A.    I'm not sure -- I guess --

24       Q.    Did Jeff --

25       A.    -- it looks like JE refers to John

1                    C. Berti

2   Eydenberg.

3      Q.    Did Jeff Mortara tell you that John

4   Eydenberg told him, "You should assume I know

5   all that's being said"?

6      A.    I don't know.  That's what I don't

7   know, whether Mr. Mortara is relaying to us

8   that Mr. Eydenberg said that to him.

9      Q.    You don't know one way or the

10  other?

11     A.    No.

12     Q.    Is there anything that would

13  refresh your recollection?

14     A.    I don't know.

15     Q.    You don't know if there is anything

16  that would refresh your recollection?

17     A.    No.

18     Q.    At the conclusion of this

19  investigation, did you draft a report?

20     A.    Yes.

21     Q.    Would this allegation have been

22  included in your report?

23          MR. SMITH:  Objection, privileged.

24          MR. VALLAS:  It's a factual

25      assertion.  How could that be privilege?

1                    C. Berti

2    interview with him about relevant information

3    he might have in the investigation.

4        Q.    How is this information relevant?

5        A.    It was information we had been

6    following up on from Mr. Abromavage's

7    meeting.

8        Q.    In what sense?  Well, you don't

9    remember what it's about.  How do you know

10   what you were following up on?

11       A.    I don't -- you are asking me -- I

12   know that we were looking into

13   Mr. Abromavage's concerns about his

14   involvement in the investigation, and I was

15   recording information related to that from

16   Mr. Mortara.

17       Q.    So, down at the -- at the -- down

18   at the -- sort of close to the bottom, it

19   says, "JM towed the line," T-O-W-E-D, "the

20   line since."

21              What does that mean?

22       A.    I don't remember.

23       Q.    "Towed the line" since what?  You

24   don't remember?

25              MR. SMITH:  I think it's asked and

1                    C. Berti

2      answered.

3      A.    Yes.  I don't remember.

4      Q.    Is there anything that would

5  refresh your recollection?

6      A.    Not that I know of.

7      Q.    On the next page, DB 2559, the

8  fourth line down, there is two arrows, or

9  it's an arrow next to which is the line, "JM

10 thinks JE knew that they would be let go

11 before they were."

12            Do you know who the "they" is in

13 that sentence?

14     A.    No.

15     Q.    Do you know if that's a reference

16 to Mr. Gurandiano?

17     A.    I'm not sure.

18     Q.    Were you sure at the time?

19            MR. SMITH:  Objection.

20     A.    I don't remember.

21     Q.    Do you remember asking Mr. Mortara

22 for clarification as to what he meant?

23     A.    No.

24     Q.    Did you ask him why Mr. Mortara

25 thought that they would be let go?

1                        C. Berti

2        A.     I'm sorry.  Could you repeat that.

3        Q.     Did you ask Mr. Mortara why he

4    thought JE knew they would be let go before

5    they were?

6        A.     I don't recall.

7        Q.     In the bottom third of the page, in

8    the left margin, there's the word "raised"

9    with a colon.  And it says, "JE -- you were

10   not a team player, what were you doing?"

11              What is that a reference to?

12       A.     I don't know.

13       Q.     Was this an allegation that

14   Mr. Eydenberg was accusing Mr. Mortara of not

15   being a team player?

16       A.     I don't know.

17       Q.     You wrote this down, though; right?

18       A.     Yes.

19       Q.     And did you ask Mr. Mortara at the

20   time for clarification?

21       A.     I don't recall.

22       Q.     Do you think it's important when

23   you are conducting an investigation to

24   understand what the interviewee is actually

25   saying to you?

1                    C. Berti

2        A.    Yes.

3        Q.    So, what was your understanding of

4    Mr. Eydenberg's communications with

5    Mr. Mortara regarding Mr. Gurandiano's

6    termination?

7        A.    I don't -- I don't know what his

8    communications were.

9        Q.    Well, when we were talking about

10   your interview with Mr. Abromavage,

11   Mr. Abromavage alleged that Mr. Eydenberg

12   reprimanded Mr. Mortara following

13   Mr. Gurandiano's termination; is that

14   correct?

15       A.    I don't know.  I would have to go

16   back to the notes and check and refer to them

17   again.

18       Q.    You don't remember?

19       A.    I don't remember if your question

20   accurately reflects what my notes reflect.

21       Q.    What did you do after you

22   interviewed Mr. Mortara in connection with

23   this investigation?

24       A.    I don't recall.

25       Q.    You don't recall what you did next?

1                    C. Berti

2      Q.    Did you interview Richard Gibb in

3  connection with this complaint?

4      A.    I don't recall.

5      Q.    Is there any reason why you

6  wouldn't?

7      A.    Yes.

8      Q.    What would be that reason?

9      A.    If we determined it wasn't

10  necessary.

11      Q.    The second line from the bottom, it

12  says, "Loyal players get resp."  What does

13  that mean?

14      A.    I am not sure.  I believe that is

15  something that Mr. Mortara relayed to us, and

16  I believe "resp" refers to responsibility.

17      Q.    So, he was saying that loyal

18  players get responsibility.

19      A.    I recorded that, so I believe that

20  is --

21      Q.    Did you consider that to be

22  relevant?

23      A.    Can I finish?

24            I believe that he would have told

25  us something to that effect in the meeting.

1           C. Berti

2      Q.    Did you consider that to be

3  relevant to Mr. Abromavage's claims that he

4  was being retaliated against for

5  participating in the investigation into

6  Mr. Gurandiano?

7           THE WITNESS:  Can you repeat the

8      question, please.

9           MR. VALLAS:  Can you read that

10      back.

11           (Record read.)

12      A.    Again, I'm not sure what it means,

13  but we would have considered all the

14  information that was provided to us as part

15  of our investigation.

16      Q.    When you say you would have

17  considered it, do you mean when you drew your

18  conclusions about the investigation?

19      A.    We would have reviewed all the

20  information given to us during the

21  investigation in order to reach a conclusion.

22  So, it -- it was information that would have

23  been reviewed.

24      Q.    What was Mr. Mortara's role at

25  Deutsche Bank?

1                      C. Berti

2       A.    He was a banker in the ECM group.

3       Q.    What was his title?

4       A.    He's a managing director.

5       Q.    The next page says, "NA --

6  threatened by JG -- he'd be gone."

7             Is that a reference to the threats

8  that we discussed earlier?

9             MR. SMITH:  Objection.

10      A.    Excuse me.  Could you repeat the

11 question?

12      Q.    Is that a reference to the threats

13 that we discussed earlier made by

14 Mr. Gurandiano against Mr. Abromavage?

15            MR. SMITH:  Same objection.

16      A.    I don't know.

17      Q.    Do you know what it's in reference

18 to?

19      A.    It's information that Mr. Mortara

20 provided us in our interview of him, and it

21 relates to -- it relates to behavior by

22 Mr. Gurandiano that was the subject of our

23 investigation involving Mr. -- allegations

24 against Mr. Gurandiano.

25      Q.    Do you know what the specific

1                    C. Berti

2   threats were?

3       A.    No.

4       Q.    Did you ask?

5       A.    Did I ask who?

6       Q.    Mr. Mortara, what he meant by this

7   statement.

8       A.    When?

9       Q.    During this interview.

10      A.    I don't recall.  We interviewed

11  Mr. Mortara during the Jason Gurandiano

12  investigation as well, so I don't recall

13  specifically what we asked him at what point

14  in time.

15      Q.    Is there a reason it's being

16  brought up here?

17      A.    I don't know.

18      Q.    A couple lines down, it says, "NA

19  frustrated because told not to do a few

20  things.  SPACS," S-P-A-C-S, hyphen, "JB knows

21  who told NA not to go to things."

22           MR. SMITH:  Objection.

23      Q.    Did I read that correctly?

24           MR. VALLAS:  What was the basis of

25      your objection, by the way?

1                      C. Berti

2    was in reference to?

3        A.    Not at this point, reading this,

4    this statement, I don't.

5        Q.    Is there anything that would

6    refresh your recollection?

7        A.    Yes.  My notes of other interviews

8    in the investigation.

9        Q.    At the very bottom of the page,

10   four lines from the bottom, it says, "MH, CC,

11   JG -- all Canadian."

12              What is the significance of that?

13       A.    It's something that Mr. Mortara

14   relayed to us.

15       Q.    Why?

16              MR. SMITH:  Objection.

17       A.    I'm not sure.

18       Q.    What do you consider the purpose of

19   these notes to be when you're conducting an

20   interview?  Why do you keep these notes?

21       A.    To record information that we

22   gather as part of our interviews.

23       Q.    To help you refresh your

24   recollection?

25              MR. SMITH:  Objection.

1                    C. Berti

2    this now.

3        Q.    The next paragraph says, "NA told

4    MH after," underlined, "he went to HR, did

5    you hear what happened?  MH on West Coast at

6    time, didn't say it was wrong thing to do,

7    just that it's important to know you did it."

8              What does that mean, "just that

9    it's important to know you did it"?

10       A.    I don't know.

11       Q.    Did you ask Mr. Hantho what that

12   meant?

13       A.    I don't recall.

14       Q.    Is Mr. Hantho saying it's important

15   to know -- for him to know that

16   Mr. Abromavage had gone to HR?

17       A.    I don't know if that's what he is

18   saying or he's telling us that he said that

19   to someone else.

20       Q.    I'm sorry.  Can you repeat that?

21             THE WITNESS:  Can you repeat my

22       answer?

23             (Record read.)

24       Q.    You took these notes, didn't you?

25       A.    Yes.

1          C. Berti

2     A.    No.

3     Q.    In the -- in the middle of the

4  page, next to the date 3/15, it says, "JG

5  heard thought" --

6     A.    I believe it says "JE."

7     Q.    "JE heard thought NA had brought

8  complaint about JG.  NA and JM caught up in

9  it."

10          Do you know what that is a

11  reference to?

12     A.    I believe it's a reference -- yes.

13     Q.    What's it a reference to?

14     A.    I believe it's a reference to this

15  SoFi issue that came up in the Gurandiano's

16  prior investigation, because I noted SoFi at

17  the top of "thought."

18     Q.    It says, "NA had brought

19  complaint."

20          Do you know what that means?

21     A.    No.

22     Q.    Did you ask Mr. Eydenberg what he

23  was referring to, "NA had brought complaint"?

24     A.    I don't recall.

25     Q.    Did you ask Mr. Eydenberg how he

1                     C. Berti

2    know.

3         Q.    On the next page, 2570, it says in

4    the middle of the page, "Post JG, JM, NA, Dan

5    Jacobowitz, all expressed interest to be

6    involved in some way.  Don't think any of

7    them did it with this motive."

8               What does that mean, "don't think

9    any of them did it with this motive"?

10        A.    Can I read the rest of the page?

11        Q.    Of course.

12              (Pause.)

13        A.    I don't know what that means, if

14   that was your question.

15        Q.    You don't know what this motive is

16   in reference to?

17        A.    No.

18        Q.    Who is Dan Jacobowitz?

19        A.    I don't know.

20        Q.    Down at the bottom of the page, it

21   says, "After Friday call, decided to

22   terminate JG, executed Monday."

23        A.    Is there a question pending?

24              MR. SMITH:  Do you just want her to

25        affirm that that's what it says?

1              C. Berti

2      A.    RG I believe refers to Richard Gibb

3  leaving for Asia, in a new role in Asia.

4      Q.    What is the good idea?

5      A.    I don't know.

6      Q.    Who is the new FIG head?

7      A.    I don't recall.

8      Q.    And the last page, 2574.

9            Down at the bottom, it says,

10  "Vinnie and" -- do you know what that next

11  word is?

12            MR. SMITH:  Tahg, T-A-H-G.  I

13       think.

14      Q.    Tahg?

15      A.    I believe that is another banker.

16      Q.    "JE told them to keep mouth shut,

17  because JG's allegations of disparagement,

18  think a lot of people were told."

19            What is Mr. Eydenberg talking about

20  here?

21      A.    I don't recall.  I don't know that

22  I -- no.

23      Q.    Were a lot of people told about

24  Mr. -- the allegations against

25  Mr. Gurandiano?

1                  C. Berti

2          MR. SMITH:  Objection.

3      A.    I don't know.

4      Q.    Did you ask?

5      A.    I don't recall.

6      Q.    Is there anything that would

7  refresh your recollection?

8      A.    My recollection as to whether I

9  asked, what?  Mr. Eydenberg?

10     Q.    Yes.

11     A.    I don't -- not that I know of.

12     Q.    Did you ever interview Vinnie?  Who

13  is Vinnie?

14     A.    I believe Vinnie refers to Vinnie

15  Badinehal.

16     Q.    And did you ever interview

17  Mr. Badinehal or Tahg?

18          MR. SMITH:  At any point in time?

19     A.    Yeah.  I was just going to ask in

20  reference to what?

21     Q.    In reference to the fact that

22  people were allegedly talking about

23  Mr. Gurandiano's allegations.

24     A.    Could you be more specific?

25  Mr. Gurandiano's allegations regarding what?

1          C. Berti

2  know.  I don't know that that's established

3  by what was written here.

4      Q.    Did you ask -- this notation in the

5  margin, question mark, "HR," did you ask

6  whether or not Mr. Bunzel was referring to

7  concerns that Mr. Abromavage had raised to

8  HR?

9      A.    I don't recall.

10     Q.    Well, why would you put a question

11 mark next to "HR" there?

12     A.    Because it might have been a

13 question, or whether a question that was

14 raised or a question as to how Mr. Bunzel may

15 have heard of it.  It could be a number of

16 things.  I can't really say why there is a

17 notation there.  It just was a question about

18 HR.

19     Q.    Did Mr. Bunzel give this

20 information in response to a question you

21 asked?

22     A.    Excuse me?

23     Q.    Did Mr. Bunzel make this statement

24 in response to a question you asked?

25     A.    I don't recall.

1                    C. Berti

2  questions before a meeting, or an interview.

3      Q.    Is this an example of that?

4      A.    Yes.

5      Q.    Can I turn your attention to

6  page -- to Exhibit 21.

7      A.    Yes.

8      Q.    These are questions for Mark

9  Hantho.  And the first question:  "Aware of

10  who participated in recent investigation re

11  JG?"

12            And then the second is:  "Aware of

13  individuals who raised concerns re JG with

14  HR?"

15            Is that correct?

16      A.    Yes.

17      Q.    Does that refresh your recollection

18  as to the question that Mr. Bunzel was

19  responding to in Exhibit 25, where it says:

20  "JG investigation, heard NA raised concerns

21  about JG, not spoke to NA directly"?

22      A.    Yes.

23      Q.    How did Mr. Bunzel know

24  Mr. Abromavage raised concerns to HR?

25            MR. SMITH:  Objection.

1          C. Berti

2     A.     I don't know.

3     Q.     Did you ask?

4     A.     I don't recall.

5     Q.     Was it concerning to you that

6  Mr. Bunzel knew that Mr. Abromavage had

7  raised concerns about Mr. Gurandiano to HR?

8     A.     Not necessarily.

9     Q.     Why not necessarily?

10     A.     Because I don't know -- I don't

11  know if Mr. Bunzel replied that he learned

12  that Mr. Abromavage raised concerns to HR

13  about Mr. Gurandiano.

14     Q.     Did you think it was important to

15  find out?

16     A.     Yes.

17     Q.     And did you find out?

18     A.     I can't recall.

19     Q.     Is there anything that would

20  refresh your recollection?

21     A.     Yes.  Looking at page 2576 at the

22  top, the third line from the top.

23     Q.     Um-hum.  What does that read?

24     A.     It says, "JB heard fr," from,

25  "Cana," and I can't understand what that is.

1           C. Berti

2   Bank?

3       A.    She was a senior banker that was

4   starting at the bank at some point in March

5   of 2016 in a -- in a -- heading a group whose

6   name I don't recall.

7       Q.    Was it FIG?

8       A.    I don't recall her specific title,

9   but she was someone who was coming to lead a

10  group that was being discussed in this -- in

11  this -- in this paragraph where I wrote about

12  an opportunity.

13      Q.    Do you understand the opportunity

14  to be a reference to the move to FIG

15  coverage?

16      A.    I just want to read around that

17  statement to help me refresh my recollection.

18            (Pause.)

19      A.    I don't know.

20      Q.    Up at the top of the page, four

21  lines down, it says, "Earlier this year NA

22  spoke with RG, others in FIG, banking

23  coverage role."

24            Does that refresh your recollection

25  about whether this opportunity referred to a

1          C. Berti

2      A.    It is generally my practice, but I

3  can't speak to this specific investigation.

4      Q.    Do you remember what documents you

5  reviewed in drawing the conclusion that you

6  "did not find violation of our DB policies"?

7      A.    No.

8      Q.    Would you have indicated what

9  documents you relied upon to make that -- to

10  draw that conclusion in your report?

11          MR. SMITH:  Objection.  I think we

12      are going to object to any testimony

13      regarding the contents of the report.

14          MR. VALLAS:  This report, I really

15      do think we are going to have to have a

16      little bit of a -- I don't see how there

17      could be any assertion of privilege over

18      this report, given that DB is -- Deutsche

19      Bank is relying on the advice of counsel

20      defense.  Are you not relying on the

21      advice of counsel?

22          MR. SMITH:  We are asserting the

23      privilege over the contents of the report

24      because it was provided to counsel in

25      connection with providing legal advice.

1          C. Berti

2    conclusion with my colleague.

3        Q.    And as a result of that review, did

4    you make a determination about whether or not

5    Mr. Abromavage's account in his October

6    complaint was credible?

7              MR. SMITH:  Objection, asked and

8        answered.

9              MR. VALLAS:  Asked and answered a

10       few times in a few different ways.

11             MR. SMITH:  That's true, too.

12             MR. VALLAS:  I'm trying to get some

13       clarity.

14             MR. SMITH:  We have covered this.

15       Q.    Let me ask it a simpler way, just

16   so we can move on.

17             What was the basis for your

18   conclusion that there was no violation of DB

19   policies?

20       A.    My conclusions was based upon a

21   review of all the information we received

22   during the course of our investigation, and

23   that included our interview of Mr. -- or our

24   interview of Mr. Abromavage and any

25   information he provided to us in the course

1          C. Berti

2    of the investigation, as well as information

3    from other sources as part of the

4    investigation.

5          It was a review of a collection of

6    information, so...

7    Q.    If you had determined that the

8    allegations made in Mr. Abromavage's

9    October 20th complaint were true, would that

10   have amounted to a violation of Deutsche

11   Bank's policies?

12         MR. SMITH:  Objection.

13   A.    I don't know.

14         MR. SMITH:  I just want to note for

15   the record that we are at seven hours.

16         MR. VALLAS:  I have probably about

17   15 minutes left.  We can get into an

18   argument about whether or not I am

19   entitled to it, but I think it would be

20   probably better served just powering

21   through.

22         MR. SMITH:  Off the record for a

23   minute.

24         (Discussion held off the record.)

25         MR. VALLAS:  Can we go back on the