# EXHIBIT A

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ----------------------------------X

5  NEIL ABROMAVAGE,

6             Plaintiff,

7      -against-                    Case No.

                                 1:18-cv-06621-VEC

8  DEUTSCHE BANK SECURITIES

9  INC.; JEFFREY BUNZEL, in his

10  official and individual capacities;

11  and MARK HANTHO, in his

12  official and individual capacities.,

13             Defendants.

14  ----------------------------------X

15

16        * * C O N F I D E N T I A L * *

17

18        DEPOSITION OF CHRISTINA BERTI

19            New York, New York

20            July 26, 2019

21

22

23

24  JOB NO. 165167

25  Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR

CONFIDENTIAL

Page 134

1                          C. Berti

2       Q.     Did Mr. Gurandiano ever complain

3    that he was being retaliated against as a

4    result of his participation in the

5    investigation into Mr. Gurandiano?

6              MR. SMITH:   Sorry.  Can you repeat

7       the question.

8              MR. VALLAS:  Could you read it

9       back.

10             (Record read.)

11             MR. VALLAS:  I did misspeak.  I

12      apologize.

13      Q.     Did Mr. Abromavage ever complain

14   that he was being retaliated against as a

15   result of his participation in the

16   investigation into Mr. Gurandiano?

17      A.     Yes.

18      Q.     When did he complain?

19      A.     I don't recall, but it was at some

20   point after the conclusion of the

21   investigation that we were just speaking of.

22      Q.     Did he complain to you?

23      A.     What do you mean by "complain"?

24      Q.     What do you understand that word to

25   mean?

CONFIDENTIAL

Page 135

1                          C. Berti

2      A.    Did he complain to me first, did he

3  complain to me alone?  I don't -- I don't --

4  I don't know.

5      Q.    You don't know -- you don't know --

6      A.    I don't know how to answer the

7  question.  Perhaps I can answer what I know.

8      Q.    That's all we can ask.

9      A.    At some point I was involved in

10  looking into concerns that Mr. Abromavage had

11  following the conclusion of the Jason

12  Gurandiano -- the investigation we just spoke

13  of regarding Mr. Gurandiano.

14      Q.    And when did that investigation

15  begin?

16      A.    I don't recall the specific time

17  that it began.

18

19          MR. VALLAS:  Mark this P-19.

20          (Deposition Exhibit P-19,

21      DB-02554-557 marked for identification,

22      as of this date.)

23      Q.    Do you recognize this document?

24      A.    Yes.

25      Q.    Does this refresh your recollection

CONFIDENTIAL

Page 136

1                              C. Berti

2  as to when Mr. Abromavage complained about

3  retaliation?

4      A.    It refreshes my recollection that

5  we met with him on October 20th of 2015.  I

6  don't know from looking at this document when

7  he complained, first complained.

8      Q.    In other words, you don't know if

9  he had complained prior to this?  Is that

10 your testimony?

11     A.    Yes.  I don't know whether he

12 complained -- I don't know when he

13 complained, first complained about the topics

14 we discussed in this meeting.  I know from

15 these notes that we had a meeting with him on

16 this date.

17     Q.    "TC with NA."  I'm assuming that

18 means telephone conference?

19     A.    Where are you looking?

20     Q.    The very top of the page.

21     A.    That's not on the top of my page.

22          MR. SMITH:  P-19?

23          MR. VALLAS:  Oh, boy.

24          Mark this P-18, please.

25          (Deposition Exhibit P-18,

CONFIDENTIAL

Page 137

1                        C. Berti

2        DB-02615-616 marked for identification,

3        as of this date.)

4        A.    Can I take a minute to look at

5    this?

6        Q.    Please.

7              (Pause.)

8        A.    What's your question?

9        Q.    So, "TC with NA."

10       A.    Yes.

11       Q.    I assume that means telephone

12   conference?

13       A.    Correct.

14       Q.    Do you remember if Mr. Abromavage

15   called you?

16       A.    He likely contacted me, and I

17   either called him back or spoke to him when

18   he first reached out to me by telephone.

19       Q.    Directly underneath, it says,

20   "Since August 2015."  What does that mean?

21       A.    That means he said to me "since

22   August 2015."  I would have recorded what he

23   told me in the conversation.

24       Q.    That the allegations that he makes

25   below have been happening since August of

CONFIDENTIAL

Page 138

1              C. Berti

2   2015?  Would that be an accurate

3   characterization?

4       A.    Yes.

5       Q.    Were you out of the office in

6   August of 2015?

7       A.    I'm sorry?

8       Q.    Were you out of the office in

9   August 2015?

10      A.    I don't recall.

11      Q.    Are you aware that Mr. Abromavage

12  made a complaint to Joanne Smith in 2015,

13  August of 2015?

14      A.    I don't recall.

15      Q.    Did you ever speak to Ms. Smith

16  about this complaint?

17      A.    About what complaint?  The

18  telephone conference --

19      Q.    Exactly.

20      A.    -- on October 20th?

21      Q.    Yes.

22      A.    I don't recall.

23      Q.    Would you turn to -- do you

24  remember -- sticking with this for a minute.

25  Do you remember about how long this

CONFIDENTIAL

Page 139

1                       C. Berti

2  conversation lasted?

3      A.    No, but -- no.  I don't know.

4      Q.    Do you remember Mr. Abromavage

5  making these allegations about being

6  purposely excluded from meetings, more

7  scrutiny, general chilliness in office?

8      A.    Looking at this document, it

9  refreshes my recollection that we -- the two

10 of us had a telephone conversation in which

11 he communicated the information that I have

12 captured on the document.

13     Q.    What is --

14     A.    Or something close to what I have

15 taken notes on here.  Yes.

16     Q.    The fifth line, "More scrutiny DTD

17 activity."  What does DTD mean?

18     A.    I believe that is a shorthand for

19 day to day.

20     Q.    It says, "Dropped from e-mail

21 communications re deals involved in specific

22 indiv who are senior, certainly one, maybe

23 another?"

24           Is that a question that you had?

25 There is a question mark at the end.

Page 140

1                          C. Berti

2      A.    I don't know.

3      Q.    You can't remember what that means?

4      A.    I recall that Mr. Abromavage was

5   relaying something about senior people but

6   not giving names at that point --

7      Q.    I see.

8      A.    -- in our conversation.  So, the

9   question mark may have been that either

10  Mr. Abromavage wasn't sure if another person

11  was involved or whether he wasn't providing

12  the names because he didn't know.  Sorry, I'm

13  speculating.

14     Q.    No, no, it's --

15     A.    But I don't know who he was talking

16  about here, and I don't know why there is a

17  question mark, so...

18     Q.    If we move down a little bit, it

19  says, "Unsure what people doing, others

20  around noticed as well.  Bkrs," which I

21  assume means bankers, ECM team member can

22  give us his perspective."

23         Who is the -- "can give us his

24  perspective," who is the "his" in that

25  sentence?

CONFIDENTIAL

Page 141

C. Berti

1

2    A.    I don't recall.

3    Q.    Below it says, "Shortly after JG

4  was fired, he was given a lecture by a senior

5  person, shaken up visibly, comp, upward

6  mobility."

7          Can you explain what that sentence

8  means?

9          MR. SMITH:  I think you have

10     omitted some text here.

11   Q.    Well, in the margin -- that is

12  fair.  In the margin, it says, "Jeff M." with

13  an arrow.

14   A.    I don't know who -- I don't know

15  who is referred to here, but Jeff M. -- I

16  don't know who "he" was in the first line,

17  "Shortly after JG fired, "he," but Jeff M. I

18  believe refers to Jeff Mortara.

19   Q.    So, this is something that happened

20  to Jeff Mortara?

21          MR. SMITH:  Objection.

22   A.    I don't know.  This is what -- this

23  is what Neil was relaying to me in this

24  telephone conversation, so I don't --

25   Q.    I'm just trying to understand.

CONFIDENTIAL

Page 142

1                         C. Berti

2      A.     That's all -- that's all I can

3   speak to at this point.

4      Q.     No, no, I understand.

5      A.     These are my notes of Neil's

6   telephone conversation with me.

7      Q.     My point is, these are your notes;

8   correct?

9      A.     Yes.

10      Q.     So, when you had the notation there

11   "Jeff M." with an arrow, did you mean by that

12   that this is an allegation about something

13   that happened with Jeff M.?

14           MR. SMITH:   Something to Jeff M.

15      what?

16      Q.     When you put the phrase "Jeff M."

17   with an arrow next to it, did you mean that

18   everything to the right of that arrow was

19   something that happened to Jeff M.?  Is that

20   what you mean by that?

21           MR. SMITH:   Objection.

22      A.     Again, I don't know what happened

23   to Jeff M. based on reading this.  I believe

24   that Mr. Abromavage was relaying this

25   information to me, and it looks like the

CONFIDENTIAL

Page 143

1                        C. Berti

2    "Jeff M." with an arrow refers to Jeff

3    Mortara being given a lecture, and again, I

4    might have a practice of filling that in

5    where the name wasn't given to me at this

6    point in the conversation, but perhaps later

7    on in the conversation, it was, and I might

8    go back in the margin and note that.

9              But again, this is what

10   Mr. Abromavage relayed to me, as far as I

11   understand, in his telephone conversation.

12        Q.   Do you remember an allegation about

13   Mr. Mortara being given a lecture by a senior

14   person shortly after Mr. Gurandiano was

15   fired?

16        A.   No.

17        Q.   You don't remember that allegation

18   at all?

19        A.   I don't remember what the lecture

20   is.  I just remember that Jeff Mortara was

21   someone who came up in our looking into the

22   matter.

23              MR. VALLAS:  Do you want to take a

24        five-minute break?

25              THE WITNESS:  Sure.

CONFIDENTIAL

Page 144

1                          C. Berti

2               (Recess from 2:24 to 2:36 p.m.)

3    BY MR. VALLAS:

4          Q.    Ready to go back on the record?

5          A.    Yes.

6          Q.    You can pass me back Exhibit 18.

7                Before we turn to Exhibit 19, I

8    want to ask you, what do you remember about

9    the substance of Mr. Abromavage's complaint?

10         A.    What complaint are you referring

11   to?

12         Q.    The complaint that he made to you

13   on the 20th of October, 2015.  I'm just

14   asking for your memory.

15         A.    Are you talking about the telephone

16   conversation we had that was documented in

17   the exhibit you just showed me?

18         Q.    I'm asking --

19         A.    Or -- I don't know that we

20   established that Mr. Abromavage complained.

21         Q.    Did he complain?

22         A.    He spoke to me in a telephone

23   conversation about the matters that were

24   recorded on that, and I believe later that

25   day, I met with him and my employee relations

CONFIDENTIAL

Page 145

1                    C. Berti

2  colleague to further explore his concerns.

3      Q.    Was that a complaint that he made?

4      A.    During the meeting that we had with

5  him, it became -- the subsequent meeting we

6  had with him after the telephone conversation

7  I had with him, it was clear that he was

8  making a complaint.

9      Q.    What do you remember of the

10 substance of the complaint?

11     A.    It would be helpful to review the

12 notes of my meeting with him.

13     Q.    Do you remember --

14     A.    I remember what -- I remember what

15 we just discussed in the telephone

16 conversation, and I believe at the end of

17 that document, there were times recorded,

18 times of day, and what I believe happened is

19 that we arranged to speak further on the

20 matter later in the day, and then the same

21 day, Michelle Kershenbaum and I met with Neil

22 to further discuss his complaint.

23     Q.    Did you request any --

24     A.    So, if I could review my notes of

25 that meeting, I could tell you more about

CONFIDENTIAL

Page 146

1                          C. Berti

2   that.

3       Q.    Before we get into that, I would

4   like to see if we can make some progress just

5   from memory.

6              Did you request the meeting?

7       A.    I can't recall.  I believe -- I

8   believe we would have mutually agreed to

9   speak further on the matter, since he was

10  calling me, and we would want to have a

11  further discussion about it.

12      Q.    Is it typical to schedule an

13  in-person discussion the same day as the

14  telephone conference?

15              MR. SMITH:  Objection.

16      A.    I don't know what's -- I can't

17  really say.  I don't know what's typical or

18  not.  It might happen, it might not happen,

19  depending on availability of everyone

20  involved.

21      Q.    Did you schedule the in-person

22  meeting shortly after the telephone

23  conference because you considered the

24  complaint to be serious?

25      A.    Not necessarily.

Page 147

1                        C. Berti

2        Q.    Do you remember whether or not that

3   was the case?

4        A.    No, I don't.  I remember that I

5   would have wanted to get more information

6   about the matter.

7        Q.    From memory, what do you remember

8   to be the substance of Mr. Abromavage's

9   complaint?

10       A.    That he felt things had changed

11  since August of 2015.

12       Q.    Since Mr. Gurandiano was

13  terminated?

14       A.    I don't know when Mr. Gurandiano

15  was terminated, but it would have been

16  sometime in the summer of 2015.

17       Q.    Did Mr. Abromavage tell you that

18  things had changed since Mr. Gurandiano had

19  been terminated?  Did he make that

20  connection?

21       A.    Again, I don't remember what the

22  significance of August 2015 was, and whether

23  that was when Mr. Gurandiano was terminated

24  or not.

25       Q.    Do you remember if Mr. Gurandiano's

CONFIDENTIAL

Page 148

1                      C. Berti

2  termination came up in the meeting?

3      A.    Which meeting?

4      Q.    The meeting on October 20th.

5      A.    The meeting with Michelle

6  Kershenbaum?

7      Q.    Yes.

8      A.    I don't remember.

9      Q.    I believe you said at the beginning

10  of the deposition that this week in

11  preparation for the deposition, you reviewed

12  some of your notes about Mr. Abromavage's

13  retaliation complaint.

14     A.    Yes.

15     Q.    Sitting here today, you don't

16  remember if he alleged that he was being

17  retaliated because of Mr. Gurandiano's

18  termination, retaliated against because of

19  Mr. Gurandiano's termination?

20     A.    I believe he was concerned about

21  whether he was being treated differently

22  because he participated in the prior

23  investigation involving Mr. Gurandiano.

24     Q.    Would you consider being treated

25  differently because of your participation in

CONFIDENTIAL

Page 149

1                       C. Berti

2    an investigation to be retaliation for

3    participating in the investigation?

4            MR. SMITH:  Objection.

5        Q.    Is there a distinction between

6    those two?

7        A.    Between two what?

8        Q.    Between being retaliated against

9    for participating in an investigation and

10   being treated differently because you

11   participated in an investigation?  Do you

12   view those two as distinct?

13           MR. SMITH:  Objection.

14       A.    Yes.

15       Q.    So, sitting here today, did

16   Mr. Gurandiano say that he -- did

17   Mr. Abromavage say that he was being

18   retaliated against or that he was being

19   treated differently?

20       A.    I can't recall the words he

21   specifically used, whether he used the word

22   "retaliation" or not, but that he was

23   concerned about what he described as things

24   being -- things have changed and --

25       Q.    How did things change?

CONFIDENTIAL

Page 150

C. Berti

1

2      A.      I don't know how things changed.  I

3  know that he reported to us that he felt that

4  things have changed.

5      Q.      How did he report to you things

6  have changed?

7      A.      How?  In our meeting.  He described

8  what he considered to be change.

9      Q.      What I meant to say is, in what way

10  had things changed according to his

11  description?

12      A.      He said he felt that he had been

13  excluded from certain meetings and activities

14  related to the business.

15      Q.      Were you aware that -- withdrawn.

16          Did Mr. Abromavage tell you that he

17  had been in discussions to move to a

18  different group?

19      A.      I don't recall.

20      Q.      What group did Mr. Abromavage work

21  at?

22      A.      He worked in ECM.

23      Q.      Were you ever aware that he had

24  been in discussions to move to a covered role

25  in the financial institutions group, the FIG

CONFIDENTIAL

Page 151

1                           C. Berti

2      group?

3          A.    I don't recall which group but that

4      he was considering other positions, but I

5      don't recall which they were specifically.

6          Q.    Do you recall Mr. Abromavage

7      telling you that the discussions ceased

8      following Mr. Gurandiano's termination?

9          A.    Which discussions?

10         Q.    About his move to a different

11     position.

12         A.    I don't recall.

13         Q.    Did Mr. Gurandiano -- withdrawn.

14              Did Mr. Abromavage explain how

15     he -- why he thought other people were aware

16     that he had participated in the investigation

17     into Mr. Gurandiano?

18         A.    Yes.  I believe he said he thought

19     other people were aware.

20         Q.    Did he say who he thought was

21     aware?

22         A.    I don't recall if he named anyone

23     specifically.

24         Q.    Was it concerning to you that other

25     people would be aware of his participation in

Page 152

1                          C. Berti

2    Mr. Gurandiano's investigation?

3              MR. SMITH:   Objection.

4         A.    Not necessarily.

5         Q.    Why not necessarily?

6         A.    Because it depends on the

7    situation.

8         Q.    Why don't we take a look at your

9    notes from your meeting with Ms. Kershenbaum

10   and Mr. Abromavage, which are in front of you

11   as Exhibit P-19.

12             Who is Michelle Kershenbaum?

13        A.    She was an employee of the bank.

14        Q.    What was her role?

15        A.    When?

16        Q.    At this time.

17        A.    She was an employee relation

18   specialist.

19        Q.    That was her title?

20        A.    I'm not sure, but she worked in

21   employee relations.  Whether that was her

22   specific functional title, I'm not sure.  She

23   was a vice president at the time.

24        Q.    When why was Ms. Kershenbaum

25   involved in this investigation?

CONFIDENTIAL

Page 153

1                         C. Berti

2       A.     Because she was assigned to work on

3   the matter by her manager.

4       Q.     Who would her manager have been?

5       A.     Debbie Barry.

6       Q.     Is there a reason why Joanne Smith

7   wasn't assigned?

8       A.     I think so.

9       Q.     What was the reason?

10      A.     I believe Joanne may have been out

11  of the office at the time.

12      Q.     So, in the first line, it says,

13  "Mid-May, term'ed JG in late July."

14             Does that refresh your recollection

15  as to when Mr. Gurandiano was terminated?

16      A.     Yes.  I believe it was sometime in

17  late July.

18      Q.     The next line says, "NA noticed

19  change but in two."  Is that what that says?

20      A.     Yes.

21      Q.     The number two?  What does that

22  mean?

23      A.     I don't know.

24      Q.     You don't remember why you wrote

25  "but in two"?

CONFIDENTIAL

Page 154

1                    C. Berti

2      A.      No.

3      Q.      And the next line says, "Changed

4  for worse, now wish he hadn't participated."

5              Was that concerning to you?

6      A.      Yes.

7      Q.      So, if we skip down to the last

8  third of the page:  "Hope it doesn't affect

9  employment comp" -- is that "int'l"?

10     A.      Yes.

11     Q.      "Mobility and progression."

12     A.      I believe that refers to internal.

13     Q.      And did Mr. Abromavage elaborate on

14  what that meant, internal mobility and

15  progression?

16     A.      I don't know.

17     Q.      A few lines down, it says "FIG IB

18  team."  Do you see that?

19     A.      Yes.

20     Q.      What is that a reference to?

21     A.      I believe "FIG IB" refers to

22  financial institutions group investment

23  banking.

24     Q.      What I mean to say is, why is that

25  notation there?

CONFIDENTIAL

Page 155

C. Berti

1

2    A.    Because it came up in our meeting.

3    Q.    In what -- in what context did it

4    come up?

5    A.    Can I read the document for a

6    second --

7    Q.    Of course.

8    A.    -- around that?

9        (Pause.)

10        Can you repeat your question.

11        MR. VALLAS:  Can you read back the

12    question.

13        (Record read.)

14    Q.    In what context did the reference

15    to "FIG IB" come up?

16    A.    It appears it's part of a statement

17    that "meetings getting set up, part of team

18    to be included and then not," and then it

19    states, "FIG investment banking team."

20    Perhaps that was the team that is being

21    described as part of -- "team" being the

22    investment banking team.

23    Q.    Was Mr. Abromavage describing a

24    potential move to FIG investment banking?

25    A.    I don't know.

CONFIDENTIAL

Page 156

1                          C. Berti

2      Q.    You took these notes; right?

3      A.    Yes.

4      Q.    Is there anything else that would

5   refresh your recollection as to what that is

6   a reference to?

7      A.    Perhaps if I read further into the

8   document, that might help.

9           (Pause.)

10     A.    Reading the document refreshes my

11  recollection that he was concerned that he

12  had been part of meetings or a team to be

13  included in meetings, and then he stated the

14  "not involving FIG investment banking."

15     Q.    Was that involving a move from ECM

16  to FIG investment banking?

17     A.    I don't know.

18     Q.    Turn to the next page.  In the

19  middle, it says -- not in the middle, toward

20  the top.  "Partner co-running ECM is JM.

21  Never spoken about it.  Returned for meeting

22  where JM reprimanded by senior person in

23  management.  JM didn't say who it was."

24          Did I read that correctly?

25          MR. SMITH:   "For" or "from"?

CONFIDENTIAL

Page 157

1                          C. Berti

2       A.    I think it's "returned from

3    meeting."  The "fr" means from.

4       Q.    That was my assumption as well,

5    but --

6            MR. SMITH:  Sorry.

7       Q.    -- I'm glad we cleared that up.

8       A.    Okay.

9       Q.    What was this a reference to?

10      A.    This was in reference to a meeting

11   that Mr. Abromavage told us about that

12   Mr. Mortara allegedly attended.

13      Q.    If you move down, on the left

14   margin, it says, "JM's person -- one of

15   four," double underlined, "with influence."

16            What is that a reference to?  Who

17   are the four with influence?

18      A.    I don't know.  No names were given

19   here.  It talks about JM's person, JM's

20   person, person.  NA is talking about one of

21   four.  I don't know.

22      Q.    Did you double underline four?

23      A.    Yes.

24      Q.    Why?

25      A.    Because I thought it was a

CONFIDENTIAL

Page 158

C. Berti

1

2  significant number to be aware of, and we did

3  not have any names associated with that, so

4  that was something that I wanted to note.

5      Q.    "Given who was let go, have

6  friendship with either other and aligned with

7  JG." Is that a reference to the four with

8  influence?

9      A.    I don't know.

10      Q.    Well, you took these notes; right?

11      A.    I did.

12      Q.    And you don't remember what -- what

13  this meant?

14      A.    No.

15      Q.    If you look on 2556, the next page.

16  It says, "Didn't tell anyone he participated

17  and they didn't approach him. I may have

18  deleted HR invite (half dozen admins and

19  junior staff) in time before anyone saw re:

20  JG investigation."

21          Can you explain what that means?

22      A.    Mr. Abromavage was stating this to

23  us. I don't -- I don't -- I don't know what

24  your question is, what does this mean.

25  Mr. Abromavage was stating to us what I

CONFIDENTIAL

Page 159

1                          C. Berti

2    recorded here.

3         Q.    Did you ask him what he meant by

4    that?

5         A.    I don't recall.

6         Q.    Was Mr. Abromavage concerned

7    because a half dozen admins and junior staff

8    were able to view his shared calendar where

9    HR invites appeared?

10              MR. SMITH:   Objection.

11        A.    I don't know.

12        Q.    When you write something down in

13   your notes that you are not -- you don't know

14   what it means?  Do you not know what it

15   means, sitting here today?

16        A.    At the time, I probably would have

17   known how this information was elicited and

18   pertained --

19        Q.    You can't remember now?

20        A.    I can't remember now what

21   specifically we were discussing or asking

22   about at that point in time.

23        Q.    This is a problem we have run into

24   a few times, though, where you don't know

25   what your notes mean.

CONFIDENTIAL

Page 160

1                           C. Berti

2              MR. SMITH:  Is that a question?

3              MR. VALLAS:  It's an observation.

4      It does not call for an answer.

5      Q.    A few lines lower:  "A couple of

6  departures.  One tech (prior FIG), one FIG."

7              Do you know who these couple of

8  departures are referring to?

9      A.    No.

10     Q.    "One tech (prior FIG)."  Did

11 Mr. Gurandiano work in FinTech?

12              MR. SMITH:  Objection.

13     A.    I believe he did.

14     Q.    Could this be a reference to

15 Mr. Gurandiano?

16              MR. SMITH:  Objection.

17     A.    I don't know.

18     Q.    Did you know at the time?

19              MR. SMITH:  Objection.

20     A.    I don't know.  There are no names

21 here, so I can't -- I can't establish that.

22     Q.    "One FIG," is that a reference to

23 Niron Stabinsky?

24              MR. SMITH:  Objection.

25     A.    I don't know.

CONFIDENTIAL

Page 161

1                         C. Berti

2       Q.    Did Niron Stabinsky work in FIG?

3       A.    I don't recall.

4       Q.    Do you recall whether or not

5    Mr. Stabinsky was terminated in July of 2015?

6       A.    No.

7       Q.    No, he wasn't, or no, you don't

8    recall?

9       A.    No to your question.

10            THE WITNESS:  Could you repeat the

11      question, please.

12            (Record read.)

13      Q.    You don't recall?

14      A.    I don't recall whether Niron

15    Stabinsky was terminated in July of 2015.

16      Q.    Do you recall whether Mr. Stabinsky

17    was ever terminated by the bank?

18      A.    Yes.

19      Q.    Why was he terminated?

20            MR. SMITH:  Objection.

21            MR. VALLAS:  What is the basis for

22      that objection?

23            MR. SMITH:  Have you established

24      that she was a decision maker in his

25      termination and therefore that she would

CONFIDENTIAL

Page 162

1                          C. Berti

2      know why he was terminated?

3           MR. VALLAS:  I don't think that the

4      question necessarily calls for that.  She

5      could have any basis for her knowledge.

6      This is a simple question about whether

7      she knows.

8           MR. SMITH:  Well, your question was

9      why was he terminated, not do you know

10     why he was terminated.

11     A.    I know he was terminated.  And your

12 question is, do I know why he was terminated?

13 No.

14     Q.    Okay.  On the last page, 2557, it

15 says, "NA told" -- this is in the middle of

16 the page, probably about ten lines down.  "NA

17 told FIG not as active now, need to do other

18 things and then asked why going there."

19          Did I read that correctly?

20     A.    I'm sorry.  Where are you on the

21 page?

22     Q.    Probably about ten lines down.

23     A.    NA said -- "NA told FIG was" --

24     Q.    Yes.

25     A.    "NA told FIG not as active now"?

CONFIDENTIAL

Page 163

1                            C. Berti

2   That sentence?

3        Q.    That's correct.   "Need to do other

4   things and then asked why going there."

5              Do you know what that means?

6        A.    No.

7        Q.    The next one says, "NA asked person

8   why said 'tagging along.'  NA said what he

9   did was in line, and other person thought

10  not."

11             Who is this person.

12       A.    I don't know.

13       Q.    Did you ask?

14       A.    I believe we did, because we would

15  normally want to ascertain that information.

16  But I believe Mr. Abromavage did not want to

17  disclose any names to us.

18       Q.    Did he say why?

19       A.    I don't recall.

20       Q.    Was he concerned about retaliation?

21             MR. SMITH:   Objection.

22       A.    I don't know.

23       Q.    Were you concerned about this

24  complaint?

25       A.    I'm concerned about all complaints

CONFIDENTIAL

Page 164

                         C. Berti

1

2   that I am involved in as an investigator.

3       Q.    Did you consider this to be a

4   serious allegation Mr. Abromavage was making?

5           MR. SMITH:   Objection.

6       A.    On behalf of the bank, I take all

7   allegations seriously that I investigate.

8       Q.    Did you take this particular one

9   seriously?

10      A.    Yes.

11      Q.    And what did you decide to do in

12  response?

13      A.    We decided to look into the

14  allegations.

15      Q.    How?

16      A.    By conducting an investigation.

17      Q.    So, how did you go about conducting

18  that investigation?

19      A.    We would have determined the

20  relevant information that would be important

21  to know, and we would have conducted

22  interviews and reviewed any other relevant

23  information that we thought was important as

24  part of our inquiry.

25      Q.    So, I understand that would be your

CONFIDENTIAL

Page 165

1                          C. Berti

2   standard practice.  I'm saying, specifically

3   with reference to this complaint, do you

4   remember what you did then?

5       A.    No.

6       Q.    Did you decide to take -- to

7   interview employees about this complaint?

8       A.    Yes.

9       Q.    How did you decide who to

10  interview?

11      A.    We determined who night have

12  information that was relevant.

13      Q.    How did you make that

14  determination?

15      A.    By reviewing our notes of the

16  meeting and the information Mr. Abromavage

17  gave us.

18      Q.    Did you review any documents other

19  than your notes?

20      A.    I don't recall.

21      Q.    Who did you decide to interview?

22      A.    We interviewed Jeff Mortara and

23  Mark Hantho, Jeff Bunzel, John Eydenberg.

24            I don't remember if that was

25  everyone.

CONFIDENTIAL

Page 169

C. Berti

1  
2  you don't remember at all what you said, you

3  disputed that.

4      A.    That's right.

5      Q.    But then you said you don't

6  remember exactly.  Was it somewhere in the

7  middle?

8      A.    You asked me a question that

9  said -- that was characterizing what I

10  believe to be a question that was asked of

11  Mr. Mortara, and I don't recall whether we

12  asked that particular question.

13          We spoke to Mr. Mortara to follow

14  up on the concerns that Mr. Abromavage shared

15  with us, about which we thought Mr. Mortara

16  might have knowledge.  That's generally what

17  I recall of our meeting.

18      Q.    Do you recall anything more

19  specific?

20      A.    Yes.

21      Q.    What do you recall more

22  specifically?

23      A.    That we asked Mr. Mortara about a

24  meeting that Mr. Abromavage had stated to us

25  that Mr. Mortara allegedly attended.

CONFIDENTIAL

Page 170

1                         C. Berti

2       Q.    I notice you are reading from

3    notes.

4       A.    Yeah, I am reading to refresh my

5    recollection.  There is a notation at the top

6    on 2555 about "return from meeting where JM

7    reprimanded by senior person in management."

8       Q.    Why don't you pass me that exhibit

9    back.

10           MR. VALLAS:  Can you mark this

11       P-20.

12           (Deposition Exhibit P-20,

13       DB-02558-563 marked for identification,

14       as of this date.)

15       Q.    Do you recognize this document,

16    Mr. Berti?

17       A.    Yes.

18       Q.    Those are notes that you kept from

19    your interview with Mr. Mortara; correct?

20       A.    Yes.

21       Q.    At the top it says "10/28/15."

22    Does that refresh your recollection as to

23    when you met with Mr. Mortara?

24       A.    Yes.

25       Q.    And let's go through this.  So, in

CONFIDENTIAL

Page 171

1                         C. Berti
2    the first third of the page, it says,
3    "Surprised that when JG said he had 65-pp
4    lawsuit.  JG prep'ing case v DB long time,
5    aware of issue."
6            What is that a reference to?
7        A.    Something that Mr. Mortara told us
8    in the interview.
9        Q.    Do you know what he was referring
10   to?
11       A.    No.
12       Q.    Did you ask him?
13       A.    I don't recall.
14       Q.    Down at the -- halfway through the
15   page on the left-hand margin, it says "JE,"
16   and then next to it, there's a quote, "You
17   should assume I know all that's being said,"
18   close quote.
19            Is that a quote that Mr. Mortara
20   was attributing to John Eydenberg?
21       A.    I am not sure.
22       Q.    What aren't you sure about?
23       A.    I'm not sure -- I guess --
24       Q.    Did Jeff --
25       A.    -- it looks like JE refers to John

CONFIDENTIAL

Page 183

1                           C. Berti

2        Q.    Did you interview Mr. Hantho?

3        A.    At some point after we met with

4   Mr. Mortara, we interviewed Mr. Hantho.

5        Q.    Do you remember when?

6        A.    No.

7        Q.    And what about Mr. Eydenberg?

8        A.    What about Mr. Eydenberg?  What's

9   your question?

10       Q.    Do you remember when you

11  interviewed Mr. Eydenberg?

12       A.    No.

13       Q.    When you testified at the beginning

14  of this deposition that earlier this week you

15  reviewed notes related to your interview --

16  your investigation into Mr. Abromavage's

17  complaint about retaliation, what notes did

18  you review?

19       A.    My notes of interviews as part of

20  Mr. Abromavage's complaints that we are

21  discussing now in October of 2015.

22       Q.    Did you interview your notes with

23  Mr. Abromavage?

24       A.    Did I what?

25       Q.    Did you review your notes with

CONFIDENTIAL

Page 184

1                          C. Berti

Mr. Abromavage?

3      A.    I did review my notes of

4  Mr. Abromavage?

5      Q.    I misspoke, you are absolutely

6  right.

7            Did you review your notes with

8  Mr. Abromavage?

9            Did you review your notes --

10 withdrawn.

11           Did you review your notes regarding

12 your interview with Mr. Abromavage?

13     A.    Yes.

14     Q.    Did you review your notes regarding

15 your interview with Mr. Mortara?

16     A.    Yes.

17     Q.    Did you review your notes regarding

18 your interview with Mr. Hantho?

19     A.    Yes.

20     Q.    How about Mr. Bunzel?

21     A.    Yes.

22     Q.    And Mr. Eydenberg?

23     A.    Yes.

24     Q.    And yet three days later, you don't

25 remember the sequence of the interviews?

CONFIDENTIAL

Page 186

1                       C. Berti
2  wouldn't have asked to see them?
3      A.    No.
4      Q.    Do you remember Mr. Mortara not
5  being willing to share them with you?
6      A.    No.
7      Q.    So, it's possible that you did see
8  them?
9      A.    (No response.)
10         MR. SMITH:  Objection.
11         MR. VALLAS:  Okay.  We are going to
12     call for the production of those notes,
13     which I think would have been responsive
14     to a request we have sent already.
15         MR. SMITH:  If they exist, we would
16     have -- if they existed, we would have
17     produced them.  So, as far as I know,
18     either they don't exist or they are not
19     in our possession.
20     Q.    And then at the bottom, I can't
21  quite make -- not at the bottom, excuse me.
22  At the fifth line from the bottom.  I can't
23  quite make out your handwriting.  It says,
24  "I" --
25     A.    It's my abbreviation wld and

CONFIDENTIAL

Page 187

1                           C. Berti

2    apostrophe t.  "I wouldn't complain to HR."

3        Q.    What does that -- do you know what

4    that means?

5        A.    I believe that was what Mr. Mortara

6    told us, that he -- I, Mr. Mortara, wouldn't

7    complain to HR.

8        Q.    Do you know why he wouldn't

9    complain to HR?

10               MR. SMITH:  Objection.

11       A.    No.

12       Q.    Did you ask?

13       A.    I don't recall.

14       Q.    On page 2561, middle of the page,

15   it says, "JE plus MH gd. friends fr." -- and

16   I can't make out quite -- I can't quite make

17   out the rest of that.

18       A.    That looks like an abbreviation for

19   Morgan Stanley.

20       Q.    So, does that sentence say, "JE and

21   MH good friends from Morgan Stanley"?

22       A.    Yes.

23       Q.    In the very next line, what does

24   that CC arrow JE, what does the rest of that

25   say?

CONFIDENTIAL

Page 188

1                      C. Berti

2       A.    "CC," an arrow, "JE sole," it's an

3  abbreviation for "industry group," "not

4  reporting to PS."

5       Q.    Could that be Paul Stefanick?

6       A.    I believe that refers to Paul

7  Stefanick.

8       Q.    And who is CC?  Is that Chris

9  Colpitts?

10      A.    I think so.

11      Q.    And then a little bit closer to the

12 bottom of the page, it says, "Others who feel

13 treated differently since JG left."

14            Do you know who those others are?

15      A.    I want to read the rest of the page

16 below it.

17      Q.    Take your time.

18      A.    Because that might help me.

19            (Pause.)

20      A.    It looks like Mr. Mortara mentioned

21 two individuals after that statement, one of

22 them RG, and another NA.

23      Q.    And who is RG?

24      A.    I believe that refers to Richard

25 Gibb.

Page 189

```
                                C. Berti
 1
 2        Q.    Did you interview Richard Gibb in
 3   connection with this complaint?
 4        A.    I don't recall.
 5        Q.    Is there any reason why you
 6   wouldn't?
 7        A.    Yes.
 8        Q.    What would be that reason?
 9        A.    If we determined it wasn't
10   necessary.
11        Q.    The second line from the bottom, it
12   says, "Loyal players get resp."  What does
13   that mean?
14        A.    I am not sure.  I believe that is
15   something that Mr. Mortara relayed to us, and
16   I believe "resp" refers to responsibility.
17        Q.    So, he was saying that loyal
18   players get responsibility.
19        A.    I recorded that, so I believe that
20   is --
21        Q.    Did you consider that to be
22   relevant?
23        A.    Can I finish?
24              I believe that he would have told
25   us something to that effect in the meeting.
```

CONFIDENTIAL

1                     C. Berti

2    was in reference to?

3        A.    Not at this point, reading this,

4    this statement, I don't.

5        Q.    Is there anything that would

6    refresh your recollection?

7        A.    Yes.  My notes of other interviews

8    in the investigation.

9        Q.    At the very bottom of the page,

10   four lines from the bottom, it says, "MH, CC,

11   JG -- all Canadian."

12            What is the significance of that?

13       A.    It's something that Mr. Mortara

14   relayed to us.

15       Q.    Why?

16            MR. SMITH:  Objection.

17       A.    I'm not sure.

18       Q.    What do you consider the purpose of

19   these notes to be when you're conducting an

20   interview?  Why do you keep these notes?

21       A.    To record information that we

22   gather as part of our interviews.

23       Q.    To help you refresh your

24   recollection?

25            MR. SMITH:  Objection.

CONFIDENTIAL

Page 200

1                           C. Berti

2   statement, assume I know all," what was

3   that -- why did you write that down?

4       A.    Because Mr. Mortara raised it.

5       Q.    Was it concerning to you that

6   Mr. Eydenberg was telling Mr. Mortara,

7   "Assume I know all"?

8             MR. SMITH:  Objection.

9       A.    I don't know if that was the case.

10      Q.    You don't know one way or the

11  other?

12            MR. SMITH:  Objection.

13      A.    No.

14      Q.    When did you interview Mr. Hantho?

15      A.    In reference to what?  This

16  investigation of Mr. Abromavage's --

17      Q.    Correct.

18      A.    -- concerns about retaliation?

19      Q.    Complaint of retaliation, correct.

20      A.    Complaint of retaliation.  Is that

21  the interview you are referring to?

22      Q.    That is the interview, yes.

23      A.    At some point after we interviewed

24  Mr. Mortara.

25      Q.    Can you pass me that exhibit back?

CONFIDENTIAL

Page 201

1                    C. Berti

2              MR. VALLAS:  Can you mark this

3         P-22.

4              (Deposition Exhibit P-22,

5         DB-02564-568 marked for identification,

6         as of this date.)

7         Q.    Do you recognize this document,

8    Ms. Berti?

9         A.    Yes.

10        Q.    Are these the notes of your

11   interview with Mr. Hantho?

12        A.    Yes.

13        Q.    And this was conducted on

14   December 3rd, 2015; is that correct?

15        A.    Yes.

16        Q.    The first line says, "JG inv --JE

17   and MH were his mentors, trying to keep him

18   in line."

19              Is that a reference to the Jason

20   Gurandiano investigation?

21        A.    I don't know.

22        Q.    You don't know if the phrase "JG

23   inv" is a reference to the investigation into

24   Mr. Gurandiano?

25        A.    I believe it is, yes.

CONFIDENTIAL

1                            C. Berti

2      Q.    So, Mr. Hantho is saying that he

3  and Mr. Eydenberg were Jason Gurandiano's

4  mentors here?

5      A.    I believe that is what Mark Hantho

6  told us, yes.

7      Q.    The next paragraph, it says, "Only

8  one who NH made aware that had raised a

9  complaint v. JG.  JG's innuendo re: IPO pitch

10  by Steve V.  JG said things to NA concerned

11  him."  Is that correct?  Did I read that

12  correctly?

13      A.    Yes.

14      Q.    What was it that JG said, that

15  Mr. Gurandiano said to Mr. Abromavage that

16  concerned Mr. Hantho?

17            MR. SMITH:   Objection.

18      A.    I don't -- I don't know that that

19  is an accurate characterization of what was

20  told to me or my notes.

21      Q.    "JG said things to NA concerned

22  him."

23      A.    Yes.  I don't know if "concerned

24  him" refers to Mr. Abromavage or, as you

25  suggested, Mr. Hantho.  I'm not clear reading

CONFIDENTIAL

Page 208

C. Berti

1  sure if that means Richard Gibb was then

2  responsible for FIG or someone else.

3  Q.    Do you have any independent

4  recollection, other than simply reading the

5  notes, what --

6  A.    I -- I do remember that Mark Hantho

7  spoke of other opportunities or positions

8  that Mr. Abromavage could have been involved

9  in, and I remember him speaking about the

10 reduced fee pool in the FIG and ECM groups

11 that would have led to considering other

12 opportunities.

13 Q.    You understand that Mr. Abromavage

14 was making an allegation that the denial of

15 his move to FIG coverage was in retaliation

16 for his participation in the investigation;

17 correct?

18 A.    No, I don't recall that was

19 specifically an allegation.

20 Q.    You were conducting an

21 investigation into Mr. Abromavage claiming

22 that he was being retaliated against in

23 connection with his participation in the

24 investigation.

Page 210

1                              C. Berti

2    questions and differently.  Can we ask one at

3    a time, and I will do my best to answer it.

4         Q.    Let's just go with the second one.

5              MR. VALLAS:  Can you read it back.

6              (Record read as follows:

7              "Q.  I understand that you are

8         saying today, as you sit here today, you

9         don't recall everything, but at the time,

10        did you have a full understanding of the

11        allegations that Mr. Abromavage was

12        making?")

13        A.    I certainly had a better

14   understanding of these allegations at the

15   time of the investigation.

16        Q.    And other than your notes which we

17   have been reviewing, is there anything that

18   would refresh your recollection as to what

19   Mr. Abromavage's allegations were?

20        A.    Not that I know of.

21        Q.    Would your report you drafted at

22   the conclusion of this investigation refresh

23   your recollection?

24        A.    I don't recall if it would or

25   wouldn't.

CONFIDENTIAL

Page 211

1                        C. Berti

2        Q.    Do you remember when you spoke with

3    Mr. Eydenberg about Mr. Abromavage's

4    complaint?

5        A.    We spoke to Mr. Eydenberg at some

6    point during this investigation after we

7    spoke to Mr. Mortara, I believe.

8        Q.    Was it the same day as Mr. Hantho?

9        A.    I don't remember.  If you showed me

10   documents or my notes, that might help me.

11       Q.    You have no independent

12   recollection if it was the same day?

13       A.    I don't.

14             MR. VALLAS:  Mark this P-24.

15             (Deposition Exhibit P-24,

16       DB-02569-574 marked for identification,

17       as of this date.)

18       Q.    Do you recognize this document,

19   Ms. Berti?

20       A.    Yes.

21       Q.    This is undated, it looks like.

22       A.    Yes.

23       Q.    Would it surprise you to learn that

24   Ms. Kershenbaum dated it the same day as your

25   interview with Mr. Hantho, December 3rd?

CONFIDENTIAL

Page 212

C. Berti

1

2      A.      No.

3      Q.      In the -- in the middle of the

4  page, next to the date 3/15, it says, "JG

5  heard thought" --

6      A.      I believe it says "JE."

7      Q.      "JE heard thought NA had brought

8  complaint about JG.  NA and JM caught up in

9  it."

10          Do you know what that is a

11  reference to?

12     A.      I believe it's a reference -- yes.

13     Q.      What's it a reference to?

14     A.      I believe it's a reference to this

15  SoFi issue that came up in the Gurandiano's

16  prior investigation, because I noted SoFi at

17  the top of "thought."

18     Q.      It says, "NA had brought

19  complaint."

20          Do you know what that means?

21     A.      No.

22     Q.      Did you ask Mr. Eydenberg what he

23  was referring to, "NA had brought complaint"?

24     A.      I don't recall.

25     Q.      Did you ask Mr. Eydenberg how he

CONFIDENTIAL

Page 225

1                          C. Berti

2    Because you wrote this; right?

3         A.    Yes.  I don't know what

4    Mr. Eydenberg was referring to when he made

5    the statement -- well, reading this now, I

6    don't know what Mr. Eydenberg was referring

7    to in terms of who was the decision maker.

8         Q.    And you didn't ask him?

9         A.    I don't know.

10        Q.    Turn to page 2572, please.

11              In the fifth line down, it says

12   "no" -- I am not sure what that next word is.

13   "Conversations"?

14        A.    I believe that is an abbreviation

15   for "conversations."

16              MR. SMITH:  "Communications"?

17        Q.    "Communications"?  Yeah, I'm not

18   sure.

19        A.    I believe it refers to C-O-N-V

20   apostrophe N-S, conversations.

21        Q.    Up above that, it says "RG leaving

22   for Asia.  New FIG head didn't start yet.

23   Good idea, not super deep fee pool, FinTech

24   massive, exploding now."

25              What is that a reference to?

CONFIDENTIAL

Page 226

1                        C. Berti

2      A.    RG I believe refers to Richard Gibb

3  leaving for Asia, in a new role in Asia.

4      Q.    What is the good idea?

5      A.    I don't know.

6      Q.    Who is the new FIG head?

7      A.    I don't recall.

8      Q.    And the last page, 2574.

9            Down at the bottom, it says,

10  "Vinnie and" -- do you know what that next

11  word is?

12            MR. SMITH:   Tahg, T-A-H-G.   I

13      think.

14      Q.    Tahg?

15      A.    I believe that is another banker.

16      Q.    "JE told them to keep mouth shut,

17  because JG's allegations of disparagement,

18  think a lot of people were told."

19            What is Mr. Eydenberg talking about

20  here?

21      A.    I don't recall.  I don't know that

22  I -- no.

23      Q.    Were a lot of people told about

24  Mr. -- the allegations against

25  Mr. Gurandiano?

CONFIDENTIAL

Page 228

1                          C. Berti

2        Q.    Well, I'm assuming Mr. Eydenberg

3    brought up Vinnie and Tahg for some purpose;

4    right?

5        A.    I don't know.

6        Q.    Was it in response to a question

7    that you asked?

8        A.    I don't recall.

9        Q.    Is there anything that would

10   refresh your recollection as to why there is

11   a reference to Vinnie and Tahg here?

12       A.    Not that I know of.

13       Q.    Did there come a time where you

14   interviewed Mr. Bunzel in connection with

15   Mr. Abromavage's complaint?

16       A.    Yes.

17       Q.    When was that?

18       A.    I don't recall the specific date.

19             (Deposition Exhibit P-25,

20        DB02575-582 marked for identification, as

21        of this date.)

22       Q.    Do you recognize this document,

23   Ms. Berti?

24       A.    Yes.

25       Q.    Does this refresh your recollection

CONFIDENTIAL

Page 229

                           C. Berti

1

2   as to when you interviewed Mr. Bunzel?

3       A.    Yes.

4       Q.    December 8, 2015?

5       A.    Yes.

6       Q.    At the very bottom of the page, it

7   says "JG inv."  Is that a reference to Jason

8   Gurandiano investigation?

9       A.    Yes.

10      Q.    "Heard NA raised concerns about

11  JG," and there is an arrow, "HR," question

12  mark.  "Not spoke to NA directly."

13            What does this mean?

14      A.    It's referring to information that

15  we learned from Mr. Bunzel regarding

16  Mr. Abromavage's concerns.

17      Q.    This is regarding Mr. Abromavage's

18  concerns?

19      A.    Yes.  Because that's what we were

20  investigating.

21      Q.    How did Mr. Bunzel know that

22  Mr. Abromavage raised concerns about

23  Mr. Gurandiano to HR?

24            MR. SMITH:  Objection.

25      A.    I don't know that that's -- I don't

CONFIDENTIAL

Page 237

                              C. Berti

1    hadn't discovered that information?

3        A.    Discovered what information?

4        Q.    What Mr. Bunzel knew about what

5    Mr. Abromavage complained to HR.

6        A.    That's not what I said.  I said it

7    was possible that I didn't -- I didn't

8    know -- could you repeat the question,

9    please.

10       Q.    Withdrawn.  We can move on.

11             THE WITNESS:  Can we take a break?

12             MR. VALLAS:  Sure.

13             (Recess from 5:28 to 5:41 p.m.)

14   BY MR. VALLAS:

15       Q.    I would like to turn your attention

16   to Exhibit 25, Ms. Berti, and I would like to

17   turn your attention to page DB-2578.

18             And in the middle of the page, it

19   says, "NA didn't pursue aggressively as

20   should have, MH and JB encouraged him to.

21   Opportunity gone, Celeste G. starts 3/16 from

22   GS, may have own views."

23             Who is Celeste G.?

24       A.    Celeste Guth, G-U-T-H.

25       Q.    And what's her role at Deutsche

CONFIDENTIAL

Page 238

                          C. Berti

1
2   Bank?
3       A.    She was a senior banker that was
4   starting at the bank at some point in March
5   of 2016 in a -- in a -- heading a group whose
6   name I don't recall.
7       Q.    Was it FIG?
8       A.    I don't recall her specific title,
9   but she was someone who was coming to lead a
10  group that was being discussed in this -- in
11  this -- in this paragraph where I wrote about
12  an opportunity.
13      Q.    Do you understand the opportunity
14  to be a reference to the move to FIG
15  coverage?
16      A.    I just want to read around that
17  statement to help me refresh my recollection.
18           (Pause.)
19      A.    I don't know.
20      Q.    Up at the top of the page, four
21  lines down, it says, "Earlier this year NA
22  spoke with RG, others in FIG, banking
23  coverage role."
24           Does that refresh your recollection
25  about whether this opportunity referred to a

CONFIDENTIAL

Page 239

<pre>
1                    C. Berti
2   role in FIG coverage?
3        A.    I'm not sure.  Because there is
4   other statements about -- RG is Richard Gibb,
5   and others in FIG, and that's Wetzel and
6   Vinnie Badinehal, and I don't recall if they
7   were FIG banking coverage people or not, so
8   I'm not sure.
9        Q.    Did you ever follow up -- sorry, go
10  ahead.
11       A.    I was just going to say, when you
12  read down another two lines, it says, "Now
13  don't need two FTMDs," which refers to, I
14  believe, two full-time MDs, "in FIG ECM," and
15  that's FIG equity capital markets, as
16  distinguished from FIG industry coverage or
17  banking coverage, I believe.
18            And then "Fee pool," arrow down,
19  which is my shorthand for down,
20  "significantly," and then there is a
21  reference to "Mark Hantho tried to facilitate
22  NA going into banking in Spec Fin AM," which
23  I believe is asset management, "coverage."
24            And so, I believe there were --
25  that was a different opportunity from what
</pre>

CONFIDENTIAL

Page 240

                              C. Berti

1

2    you described as FIG coverage, so, I am a

3    little confused -- confused about what the

4    opportunities are.

5         Q.    You are familiar with Mr. --

6         A.    The opportunity gone that's

7    referred to, Celeste G., and where that fits

8    in.

9         Q.    You are familiar with

10   Mr. Abromavage's allegation that he was in

11   discussions about a move to FIG coverage;

12   correct?

13        A.    Excuse me?  Can you repeat that?

14        Q.    Are you familiar with

15   Mr. Abromavage's allegations that he was in

16   discussions in the summer of 2015 about a

17   move to FIG coverage?

18        A.    I don't recall.

19        Q.    You don't recall --

20        A.    I don't recall the specific

21   allegation regarding FIG, Mr. Abromavage

22   discussing a FIG coverage role in that

23   summer, or an allegation regarding that.

24        Q.    I believe it's something that we

25   spoke about at length earlier, but I think we

CONFIDENTIAL

Page 241

1                      C. Berti

2    can move on for the moment.

3        A.    Yes.

4        Q.    Mr. Bunzel is telling you on

5    December 8th, 2015, that this opportunity is

6    gone because "Celeste G. starts 3/16 from GS,

7    may have own views."

8              Do you have any idea when --

9    withdrawn.

10             Did you ever ask Mr. Abromavage

11   when the discussions about this opportunity

12   ceased?

13       A.    I don't recall.

14       Q.    Did you ever follow up with

15   Mr. Abromavage to explain Mr. Bunzel's

16   position?

17       A.    No.

18       Q.    Can we turn to page 2580.

19       A.    And I am sorry, can I go back to my

20   answer?

21       Q.    Sure.

22       A.    Can I ask a clarifying question?

23       Q.    Sure.

24       A.    Mr. Bunzel's position regarding

25   what?

1                         C. Berti
2    ago, when I conducted this investigation.
3         Q.    Is there anything that would
4    refresh your memory as to whether or not you
5    were clear on what that opportunity was at
6    the time other than these notes?
7         A.    No, not that I'm aware of.
8         Q.    Would your report refresh your
9    recollection about this opportunity?
10        A.    I don't know.
11        Q.    Turning you to page 2580.  Excuse
12   me, let's look at 2579.
13              At the bottom of the page, it says,
14   "NA heard from California, NA invited
15   himself" --
16        A.    I don't know that CA stands for
17   California.  It could refer to an individual.
18        Q.    You're absolutely right.  Do you
19   know what that is a reference to?
20        A.    No.
21        Q.    "NA heard from CA.  NA invited
22   himself" --
23        A.    Can I answer?  I think I do now, if
24   you let me just read the part above.  There
25   is an individual mentioned, Carlos Alvarez,

CONFIDENTIAL

1                        C. Berti

2    conclusion with my colleague.

3        Q.    And as a result of that review, did

4    you make a determination about whether or not

5    Mr. Abromavage's account in his October

6    complaint was credible?

7             MR. SMITH:  Objection, asked and

8        answered.

9             MR. VALLAS:  Asked and answered a

10       few times in a few different ways.

11            MR. SMITH:  That's true, too.

12            MR. VALLAS:  I'm trying to get some

13       clarity.

14            MR. SMITH:  We have covered this.

15       Q.    Let me ask it a simpler way, just

16   so we can move on.

17            What was the basis for your

18   conclusion that there was no violation of DB

19   policies?

20       A.    My conclusions was based upon a

21   review of all the information we received

22   during the course of our investigation, and

23   that included our interview of Mr. -- or our

24   interview of Mr. Abromavage and any

25   information he provided to us in the course

CONFIDENTIAL

Page 263

```
 1                    C. Berti
 2   of the investigation, as well as information
 3   from other sources as part of the
 4   investigation.
 5           It was a review of a collection of
 6   information, so...
 7      Q.    If you had determined that the
 8   allegations made in Mr. Abromavage's
 9   October 20th complaint were true, would that
10   have amounted to a violation of Deutsche
11   Bank's policies?
12           MR. SMITH:  Objection.
13      A.    I don't know.
14           MR. SMITH:  I just want to note for
15      the record that we are at seven hours.
16           MR. VALLAS:  I have probably about
17      15 minutes left.  We can get into an
18      argument about whether or not I am
19      entitled to it, but I think it would be
20      probably better served just powering
21      through.
22           MR. SMITH:  Off the record for a
23      minute.
24           (Discussion held off the record.)
25           MR. VALLAS:  Can we go back on the
```

CONFIDENTIAL

Page 265

1                          C. Berti

2    into as part of the process you mentioned to

3    me this past morning."

4            What was the process that you had

5    mentioned to Mr. Abromavage that past

6    morning?

7        A.    I don't recall what was discussed

8    the prior Monday morning.

9        Q.    I'm going to refer you very briefly

10   to Exhibit 27 again.  These were the notes of

11   your close-out call with Mr. Abromavage.

12           In the last paragraph, you say,

13   "Nothing else to say at this time, though not

14   necessarily done either."  Right?

15           MR. SMITH:  Objection.

16           Who are you attributing that to?

17           MR. VALLAS:  This was Ms. Berti's

18       notes of the close-out call.

19       Q.    Was that a statement that you made

20   on the call?

21       A.    I don't believe so.

22       Q.    Was that a statement

23   Ms. Kershenbaum made on the call?

24       A.    I don't believe so.

25       Q.    Is that a statement that

CONFIDENTIAL

Page 266

1                          C. Berti

2    Mr. Abromavage made on the call?

3        A.    I believe so, yes.

4        Q.    What did he mean by "not

5    necessarily done"?

6              MR. SMITH:   Objection.

7        A.    I don't know.

8        Q.    Did you ever look up Mr. Mortara's

9    exit interview?

10        A.    I don't know if Mr. Mortara had an

11    exit interview.

12        Q.    Did you try and find out, in

13    response to this information?

14        A.    I don't recall if I looked into it

15    or whether perhaps my colleague Michelle

16    Kershenbaum looked into it.

17              MR. SMITH:   I'll ask you to mark

18         that as P-29.

19              (Deposition Exhibit P-29,

20         DB-02582-583 marked for identification,

21         as of this date.)

22        Q.    Are you familiar with that

23    document, Ms. Berti?

24              (Pause.)

25        Q.    In the interest of time, I only

CONFIDENTIAL

Page 267

1                          C. Berti

2    have a couple of questions about this

3    document.  I'm not sure it's necessary to

4    read the whole thing.

5               Are you familiar with it?

6        A.    Yes.

7        Q.    What does "LM with NA" mean?

8        A.    That looks like my shorthand for

9    left message with Neil Abromavage, on

10   February 4th of 2016.

11       Q.    This is after the close-out call;

12   correct?

13       A.    I believe so.  If you could just

14   show me the document that I stated was the

15   close-out conversation.

16               Yes, this was after that call.

17       Q.    Underneath the notation "left

18   message," there is a series of notes about

19   what appears to be a conversation.  Did you

20   end up connecting with Mr. Abromavage in

21   February of 2016?

22       A.    Yes, I believe we did.  At some

23   point after I left a message with him, we

24   spoke.  But again, I don't know exactly when

25   that was, but likely around this time, but I

1                         C. Berti

2    don't know if it was that day.

3         Q.    In the middle of the page, it says,

4    "Don't know if we spoke to Jeff M. in exit

5    with Cana."

6         A.    Yes.

7         Q.    Does that refresh your memory about

8    whether or not Mr. Mortara had an exit

9    interview?

10        A.    No.

11        Q.    Is that you saying that you don't

12   know if we spoke to Jeff M., or is that

13   Mr. Abromavage?

14        A.    I believe it was Mr. Abromavage's

15   statement that he doesn't -- he didn't know

16   if we spoke to Jeff Mortara in exit with

17   Cana.

18        Q.    On the next page, the penultimate

19   sentence, it says, "Comp is coming up and we

20   will see what happens."

21             Do you understand "comp" to be a

22   reference to the annual compensation meeting?

23        A.    What do you mean by "annual

24   compensation meeting"?

25        Q.    Do managers have meetings with

CONFIDENTIAL

Page 269

                         C. Berti

1

2  employees to discuss incentive compensation

3  in February of each year?

4      A.    Are you saying at this time -- at

5  this time, was that the timeline?

6      Q.    I withdraw that question.  Let me

7  rephrase it.

8              What do you understand the phrase

9  "comp is coming" to mean?

10     A.    By "comp is coming up," in

11 February, around that time, I understand that

12 to refer to communications regarding

13 employees' year-end compensation and salary

14 discussions.

15     Q.    Do you know whether or not

16 Mr. Abromavage received a bonus in 2016 for

17 his performance in 2015?

18     A.    I don't recall.

19     Q.    Do you recall being consulted in

20 connection with that decision?

21     A.    No.

22     Q.    Are you aware that Mr. Abromavage

23 was terminated in August of 2016?

24     A.    No.

25     Q.    Are you aware that Mr. Abromavage