USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/19/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
   NEIL ABROMAVAGE,                         :

                                            :

                                            :

                      Plaintiff,      :

                                            :       18-CV-6621 (VEC)

         - against -               :

                                            :        OPINION

                                            :

   DEUTSCHE BANK SECURITIES INC.;     :
   JEFFREY BUNZEL, in his official and individual   :
   capacities; and MARK HANTHO, in his official   :
   and individual capacities,               :

                                            :

                     Defendants.   :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Plaintiff Neil Abromavage sued his employer, Deutsche Bank Securities Inc. ("DBSI"),

and his former supervisors, Jeffrey Bunzel and Mark Hantho, for retaliation in violation of Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*; and the New York City Human

Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*  *See* Compl., Dkt. 1, ¶¶ 80–93.

Plaintiff also sued Bunzel and Hantho for aiding and abetting violations of the NYSHRL and the

NYCHRL.  *Id.* ¶¶ 94–102.  Defendants have moved for summary judgment on all claims.  For

the reasons discussed below, Defendants' motion is GRANTED as to all but Plaintiff's

NYCHRL claims, which are dismissed for lack of subject-matter jurisdiction.

## BACKGROUND

      Abromavage began working at DBSI in 2000.  Def. 56.1 Stmt., Dkt. 73 ¶ 9.  He held

various positions over his 16 years with the Bank.  *Id.* ¶¶ 11–15.  During the period at issue in

this lawsuit, Abromavage was the co-head and later the head of the Financial Institutions Group

within Equity Capital Markets ("FIG ECM").[1]  Pl. 56.1 Stmt., Dkt. 82-5 ¶ 355.  Abromavage reported to Jeffrey Bunzel, the head of DBSI's ECM business in the Americas.  Def. 56.1 Stmt. ¶ 3.  Bunzel, in turn, reported to Mark Hantho, the Global Head of DBSI's ECM business.  *Id.* ¶¶ 2, 6.  As Abromavage's supervisors, Hantho and Bunzel were responsible for determining Abromavage's compensation and for taking other managerial actions affecting him.  *Id.* ¶ 209 (undisputed).

On April 26, 2015, an anonymous complaint, not made by Abromavage, was made to DBSI regarding Jason Gurandiano, a coverage banker.  Pl. 56.1 Stmt. ¶ 466.  The complaint included allegations of racial discrimination against South Asian employees, among other unprofessional and inappropriate conduct.  *Id.* ¶ 467.  On May 19, 2015, Abromavage was interviewed as part of DBSI's internal investigation of the complaint.  Def. 56.1 Stmt. ¶ 54.  Abromavage alleges that, during his interview, he provided detailed information about Gurandiano's misconduct, including that he witnessed Gurandiano repeatedly using racial slurs towards South Asian employees and that he created a "locker room atmosphere" with respect to his treatment of women.  Pl. Resp., Dkt. 69 at 5.  Following its investigation, DBSI concluded that Gurandiano "behaved in an abusive and unprofessional manner towards colleagues," used derogatory terms to refer to Indian employees, and created a toxic work environment.  Pl. 56.1 Stmt. ¶ 488.  As a result, on July 27, 2015, DBSI terminated Gurandiano's employment.  Def. 56.1 Stmt. ¶ 92 (undisputed).

---

[1]      Abromavage became the sole head of FIG ECM after his co-head, Jeffrey Mortara, left DBSI.  Def. 56.1 Stmt., Dkt. 73 ¶ 15; Abromavage Decl., Dkt. 71 ¶ 3.

Abromavage alleges that Bunzel, Hantho, and John Eydenberg[2] retaliated against him for the role he played in the Gurandiano investigation.  Pl. Resp. at 1.  In response to the perceived retaliation, Abromavage filed complaints with DBSI's human resources ("HR") department on August 10, 2015, and October 10, 2015.  Pl. Resp. 2, 7–8.  On December 1, 2015, Abromavage spoke to HR about the status of his complaints.  Pl. 56.1 Stmt. ¶ 653.  After several witness interviews, HR concluded that Bunzel and Hantho had not retaliated against Abromavage or otherwise violated DBSI policies.  Def. 56.1 Stmt. ¶ 262; Pl. 56.1 Stmt. ¶ 684.  HR informed Abromavage of its findings on January 25, 2016.  Pl. 56.1 Stmt. ¶ 687.  In his last communication with HR, on February 4, 2016, Abromavage allegedly shared additional concerns about further perceived retaliation.  Abromavage Decl., Dkt. 71 ¶ 116; Def. 56.1 Stmt. ¶ 263 (undisputed).

Abromavage contends that Defendants' retaliation involved seven adverse employment actions: (i) the artificial depression of his revenue; (ii) the failure to move Plaintiff to a new position; (iii) reassignment of his clients; (iv) denial of funding to attend conferences; (v) a negative performance review; (vi) no 2015 bonus; and (vii) termination from DBSI.  Pl. Resp. 6–9, 20–24.

Abromavage commenced this lawsuit on July 23, 2018.  He alleges retaliation in violation of Title VII, NYSHRL, and NYCHRL.  Compl. ¶¶ 80–93.  Abromavage also alleges that the individual Defendants aided and abetted violations of the NYSHRL and NYCHRL.  *Id.* ¶¶ 94–102.

---

[2]     Eydenberg, who is not an individual defendant, was the Global Head of Investment Banking Coverage and was Gurandiano's indirect supervisor.  Gurandiano's direct supervisor was Chris Colpitts, the Head of Technology, Media, and Telecom.  Def. 56.1 Stmt. ¶ 33 (Pl. Resp.).  Colpitts, in turn, reported to Eydenberg.  Def. 56.1 Stmt. ¶ 328.

**DISCUSSION**

## I.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted)).

The Court must "construe the facts in the light most favorable to the non-moving party and

resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank*

*of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (alterations omitted) (quoting

*Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009)).

## II.    Defendants' Motion for Summary Judgment Is Granted as to Plaintiff's Title VII and NYSHRL Claims

### A.    Applicable Law

Title VII retaliation claims are evaluated pursuant to the familiar *McDonnell Douglas*

burden-shifting standard.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citing *Jute v.*

*Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  The plaintiff must first establish

a *prima facie* case.  *Hicks*, 593 F.3d at 164 (citations omitted).  A plaintiff establishes a *prima*

*facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the

defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal

connection between the protected activity and the adverse employment action."  *Jute*, 420 F.3d at

173.

"If the plaintiff sustains this initial burden, a presumption of retaliation arises. . . .  The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173) (internal quotation marks omitted).  And last, "if the defendant proffers a legitimate, non-retaliatory reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is 'a mere pretext for retaliation.'" *D'Andrea v. Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013)).  The plaintiff must also demonstrate that "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *D'Andrea*, 765 F. App'x at 605 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

"The ultimate burden of persuading the trier of fact that the defendant intentionally retaliated against the plaintiff remains at all times with the plaintiff." *D'Andrea*, 765 F. App'x at 605 (cleaned up).  On summary judgment, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited retaliation occurred." *Id.* (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000)) (cleaned up).

Retaliation claims pursuant to NYSHRL are governed by the same standards as Title VII. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  Claims that individual defendants aided and abetted violations of NYSHRL, in violation of N.Y. Exec. L. § 296(6), are tied to the primary NYSHRL violation.  If a plaintiff is unable to establish retaliation pursuant to NYSHRL, then he likewise cannot establish liability for aiding and abetting such retaliation. *See White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (collecting cases).[3]

---

[3]     The parties agree that the two claims are tied in this manner. *See* Def. Mem. of Law, Dkt. 62-21 at 25; Pl. Resp., Dkt. 69 at 11, n.7.

**B.      Abromavage Has Established a Prima Facie Case of Retaliation**

Defendants do not dispute that Abromavage suffered adverse employment actions.  Def. Mem. of Law, Dkt. 62-21 at 10–15.  Defendants contend, however, that Abromavage cannot satisfy the remaining three elements of his *prima facie* case.  For the reasons discussed below, construing the evidence in the light most favorable to him, Abromavage has demonstrated that he engaged in protected activity, that Defendants knew of some of the protected activity, and that the *prima facie* causation standard has been met for the seven adverse employment actions. Accordingly, Abromavage has established a *prima facie* case.

**1.      Abromavage Engaged in Protected Activity**

Abromavage asserts that he engaged in two sets of protected activities: he was a witness in the internal DBSI investigation of discrimination allegations against Gurandiano, and he complained about being retaliated against for being a witness in the Gurandiano investigation. Compl. at 1; Def. 56.1 Stmt. ¶¶ 252, 349 (Pl. Resp.).

With respect to Abromavage's participation in the Gurandiano investigation, Defendants dispute whether Abromavage's actions rise to the level of activity protected by Title VII.  Def. Mem. of Law at 12.  Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000(e)(3)(a).[4]  This provision, known as the opposition clause,

---

[4]      Title VII also makes it unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000(e)(3)(a).  But this provision, known as the participation clause, is confined to investigations, proceedings, or hearings that "occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."  *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 49 (2d Cir. 2012); *see also Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015).  Because the investigation at issue in this action was internal and not related to charges filed with the EEOC, the participation clause is not applicable.

prohibits retaliation based on an employee's opposition to discrimination.  The word "oppose," which is not defined in the statute, has been interpreted, in part, to mean "adverse to, as in opinion" and does not require any action "to advance a position beyond disclosing it."  *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276, 277 (2009).  Moreover, the Supreme Court has recognized that an employee's communication of his belief that another employee has engaged in discrimination "virtually always" constitutes protected opposition.  *Id.* at 276 (citing EEOC Compl. Man. §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)).  Given the broad scope of what constitutes opposition, the Supreme Court has held that protection pursuant to the opposition clause "extends to an employee who speaks out about discrimination not on [his] own initiative, but in answering questions during an employer's internal investigation."  *Id.* at 273.[5]

While communication can constitute protected activity pursuant to the opposition clause, such communication must be critical of the conduct at issue.  The Supreme Court in *Crawford* acknowledged that communication that is not "ostensibly disapproving" may not qualify as protected activity.  *See id.* at 276–77 ("It is true that one can imagine exceptions [to what constitutes protected activity], like an employee's description of a supervisor's racist joke as hilarious . . . .").  Defendants contend that Abromavage's statements during his interview did not constitute protected activity because he "did not allege or testify that he supported other employees" and because he did not even know the identity of the original complainant.  Def.

---

[5]       *Crawford* involved a plaintiff who answered questions about instances of sexual harassment she herself experienced as part of a larger sex discrimination investigation of her supervisor.  *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.,* 555 U.S. 271, 274 (2009).  But the holding in *Crawford* is not limited to instances in which the complainant reports discrimination that he or she personally experienced.  *See Littlejohn*, 795 F.3d at 317 (2d Cir. 2015) ("*Crawford* is consistent with our prior decisions, in which we have explained that protected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of other employees . . . ."); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (holding that the opposition clause protects "expressing support of co-workers").  Accordingly, for the purpose of determining whether Abromavage engaged in protected activity, it is of no moment that he provided information about Gurandiano's treatment of other DBSI employees.

Mem. of Law at 12.  That may be true, but Abromavage "gave no indication that [Gurandiano's conduct] was anything but offensive to [him]."  *Crawford*, 555 U.S. at 277, n.2.  Defendants cannot point to a single fact that would demonstrate that "Plaintiff found Gurandiano's racism to be anything other than repugnant."[6]  Pl. Resp. at 13, n.9; *see also* Abromavage Decl. ¶ 29. Viewing the evidence in the light most favorable to Abromavage, a reasonable jury could conclude that he opposed Gurandiano's conduct.  Accordingly, Abromavage's interview as part of the Gurandiano investigation constitutes protected activity.[7]

Abromavage's internal complaints to DBSI about the retaliation he allegedly personally experienced also constitute protected activity.  *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 588 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (finding that an internal retaliation complaint is protected activity); *Flynn v. N. Y. State Div. of Parole*, 620 F. Supp. 2d 463, 489 (S.D.N.Y. 2009) (citing *Martinez v. N.Y.C. Dep't of Educ.*, 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008) (recognizing that complaints of retaliation constituted protected activity).

---

[6]    Defendants further argue that to constitute protected activity, an employee "must actively support other employees."  Def. Mem. of Law at 11.  Defendants' argument mischaracterizes the caselaw.  In *Littlejohn v. City of New York*, the Second Circuit considered the extent to which the protections of the opposition clause extend to activities by employees whose "job responsibilities involve preventing and investigating discrimination."  795 F.3d at 316.  Because reporting and investigating are not covered activities pursuant to the opposition clause, for such activity to qualify, employees in such roles must be critical of the conduct in question, personally complain about it, or actively support other employees in asserting their Title VII rights.  *Id.* at 318.  The Second Circuit's holding in *Littlejohn* is not more stringent than the Supreme Court's holding in *Crawford*; the Second Circuit simply applied the notion that activity protected by the opposition clause must involve opposition to the unique considerations facing employees whose jobs require them to investigate discrimination claims.  Not only do such unique considerations not apply to Abromavage, whose position did not entail investigating discrimination, but Abromavage was nothing but critical of Gurandiano's behavior.  Accordingly, even pursuant to the *Littlejohn* standard, Abromavage clearly engaged in activity protected by the opposition clause.

[7]    Defendants also contend that Abromavage did not engage in protected activity because the conduct Abromavage reported during his interview did not concern conduct that violated Title VII.  Def. Mem. of Law at 12. This argument is meritless; Abromavage asserts that he told HR that he had "repeatedly witnessed Gurandiano use racial epithets" with respect to South Asian employees, including to employees who were junior to him, that Gurandiano sent an email with racial slurs, and that he targeted three employees for racial abuse.  Pl. Resp. at 5, 15. Even DBSI recognized that Gurandiano violated "the Bank's EEO/Anti-Harassment and Non-Discrimination Policy," in part because of his use of derogatory terms towards Indian employees.  DBSI Answer, FINRA Dispute Resolution, Dkt. 75-23 at 8.

Although Defendants assert that Plaintiff did not testify that he suffered adverse employment actions because of his internal retaliation complaints, Def. Mem. of Law at 13, n.13, Abromavage has been nothing but clear from the time he filed this case: he believes Defendants retaliated against him because of his participation in the Gurandiano investigation and because of his "subsequent complaints about such unlawful retaliation by Defendants." Compl. at 1.

In short, Abromavage has demonstrated that he participated in protected activities, satisfying the first element of a *prima facie* case.

### 2.  Defendants Knew of Some of Abromavage's Protected Activities

Defendants assert that Hantho and Bunzel were not aware that Abromavage had participated in the Gurandiano investigation. Pl. 56.1 Stmt. ¶ 492 (undisputed); Def. 56.1 Stmt. ¶ 94. Although Abromavage never told Hantho and Bunzel about his interview, Def. 56.1 Stmt. ¶ 75, viewing the evidence in the light most favorable to Abromavage, a reasonable juror could conclude that Hantho and Bunzel knew that he participated. Hantho was on a July 24, 2015, conference call in which HR provided "a long, long, list" of the allegations against Gurandiano. Pl. 56.1 Stmt. ¶¶ 493–495. Additionally, the HR report about Abromavage's retaliation complaints states that Hantho was briefed on the findings of the Gurandiano investigation and that he "knew that Abromavage's part in it was relatively small." Def. 56.1 Stmt. ¶ 75 (Pl. Resp.). Although the co-author of the report disputes that the report means that Hantho was aware that Abromavage had participated in the investigation, Def. Reply, Dkt. 77 at 3, n.2, a jury could conclude that Hantho learned of Abromavage's participation on July 24, 2015.

With respect to Bunzel, he too claims that he was unaware of who participated in the Gurandiano investigation. Def. 56.1 Stmt. ¶ 94. But the notes taken by HR during an interview with Bunzel as part of the investigation into Abromavage's retaliation complaints suggest

otherwise.  *See* Notes, Dkt. 75-24 at 1 ("JG Inv. – heard NA raised concerns abt JG, not spoke to NA directly."); *id.* at 2 ("JB heard . . . that he went to HR.").  A reasonable juror could conclude from these notes that Bunzel was also aware that Abromavage had participated in the Gurandiano investigation.

With respect to whether Hantho and Bunzel knew about Abromavage's retaliation complaints, there is no dispute that they were both interviewed by HR as part of that investigation.  Hantho was interviewed on December 3, 2015, Pl. 56.1 Stmt. ¶ 659 (undisputed), and Bunzel was interviewed on December 8, 2015, *id.* ¶ 676 (undisputed).  But Abromavage presents no facts to support his contention that Hantho and Bunzel learned of Abromavage's retaliation complaints before they were interviewed as part of that investigation, and he offers no evidence that tends to show that Hantho and Bunzel were aware that he spoke to HR on February 4, 2016.  Thus, a reasonable factfinder could conclude that Hantho and Bunzel learned about Abromavage's retaliation complaints during their December 2015 interviews but could not conclude that they were aware of Abromavage's February 4, 2016, telephone call with HR.

In short, Abromavage has demonstrated that a reasonable factfinder could conclude that Defendants knew he participated in the Gurandiano investigation and knew that he complained of retaliation but could not find that Defendants knew about his February 4, 2016, telephone call with HR.

### 3.    Plaintiff Has Established a Causal Connection between his Protected Activities and the Seven Adverse Employment Actions

At the *prima facie* stage, proof of causation can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the

plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)) (alteration omitted).

To demonstrate a causal link, Abromavage offers indirect evidence; he argues that the protected activity was "followed closely" by the adverse employment actions, and he contends that Hantho and Bunzel's friendship with Gurandiano and their history of protecting him motivated them to retaliate.  Temporal proximity is enough to establish a *prima facie* case of retaliation.  *Dhar v. City of New York*, 655 F. App'x 864, 865–66 (2d Cir. 2016) (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)).  Because Abromavage has demonstrated temporal proximity for all seven adverse employment actions, the Court declines to consider indirect evidence about Hantho and Bunzel's alleged relationship with Gurandiano at this stage.[8]

Temporal proximity may demonstrate the requisite causal link at the *prima facie* stage when the proximity is "very close."  *Dhar*, 655 F. App'x at 865–866 (internal citation omitted).  Courts in this District generally find two or three months to be the outer limit for establishing causation based on temporal proximity.  *See, e.g.*, *Lambert v. Trump Int'l Hotel & Tower*, No. 15-CV-582, 2018 WL 1633765, at *11 (S.D.N.Y. Mar. 31, 2018) ("[T]he passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line.") (citations omitted); *Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 538 (S.D.N.Y. 2017) ("The interview took place less than two months after the discussion with Amodio, an amount of time that the Second Circuit has found to be sufficient for the purpose of establishing temporal proximity.") (citations omitted); *Percy v. New York (Hudson Valley*

---

[8]      Because temporal proximity is not enough on its own to establish that a retaliatory motive was the but-for cause of the adverse action, *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014), the Court considers the individual Defendants' relationships with Gurandiano at the final stage of the *McDonnell Douglas* framework. *See infra* Section II.D.

*DDSO)*, 264 F. Supp. 3d 574, 586 (S.D.N.Y. 2017) ("Generally, three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.") (cleaned up).

The parties dispute when three of the seven adverse employment actions occurred, an issue which must be resolved in order to determine whether such actions happened within two to three months of when Defendants learned of the protected activity. Abromavage asserts that Defendants artificially depressed his revenue by reallocating Special Purpose Acquisition Corporations ("SPACs") revenue away from him. Pl. Response at 8, n. 5 (citing Pl. 56.1 Stmt. ¶ 583). Defendants argue that this reallocation occurred on May 1, 2015, more than two weeks before Abromavage was interviewed as part of the Gurandiano investigation, his first protected activity. Def. Mem. of Law at 6–7, 19. Defendants assert that the reallocation corresponded with the move of Eric Hackel, another Managing Director who focused on SPAC transactions, to ECM. *Id.* Before Hackel's move, SPACs revenue was credited to Abromavage as the co-head of FIG ECM even though he neither originated nor executed SPACs transactions; once Hackel moved to ECM, he received credit for his own work on SPACs. *Id.* Abromavage does not contest that Hackel moved to ECM or that Hackel's work focused on SPACs. Abromavage instead argues that the decision to reallocate SPACs revenue away from Abromavage did not occur until July 2015, after Plaintiff had been interviewed as part of the Gurandiano investigation and after Hantho and Bunzel became aware of Abromavage's role in that investigation. Pl. 56.1 Stmt. ¶¶ 593, 600. Abromavage supports his contention by arguing that Hantho and Bunzel told him about their decision to carve out SPACs revenue after Gurandiano was terminated. Pl. Resp. at 8, n.5. He also argues that the first time Defendants gave him a revenue breakdown that excluded SPACs from his revenue numbers was at the end of 2015, well after Hackel had moved

to ECM; Abromavage argues that this is evidence that the decision to strip him of this revenue was unrelated to Hackel's move and occurred after Gurandiano's termination.  Abromavage Decl. ¶ 102.  Defendants provide no documentary evidence that tends to prove that their decision to reallocate SPACs revenue was made at the time of Hackel's transfer.  There is, therefore, a question of fact whether this adverse employment action occurred at the end of July 2015.  For purposes of deciding Defendants' motion for summary judgment, the Court must assume that a jury would resolve that question in Plaintiff's favor.

The parties also dispute when DBSI decided not to approve Abromavage's request to move to a new role in FIG investment banking coverage.  Abromavage claims that "[w]ithin days of Gurandiano's termination, Plaintiff's planned move to a more favorable role in investment banking coverage, which was described as 'urgent' in the weeks before July 24, suddenly evaporated."  Pl. Resp. at 1.  Abromavage points to perceived differences between a conversation he had on July 6, 2015, before Gurandiano's termination, and a conversation he had on August 3, 2015, after Gurandiano's termination and after Hantho and Bunzel had allegedly learned about Abromavage's role in the investigation.[9]  In the July 6, 2015 discussion, Hantho told Abromavage that there was a need for urgency with respect to the move.  *See* Conversation Tr., Dkt. 75-28 at 13.[10]  But on August 3, 2015, Bunzel told Abromavage that "new management's got to step back and assess the whole thing" and that Abromavage should "sit tight."  Conversation Tr., Dkt. 75-29 at 2, 7.

---

[9]     Abromavage secretly recorded many of his conversations with other DBSI employees.  Although his surreptitious taping began before Gurandiano was terminated, Abromavage explained that he did so to "protect himself," Pl. 56.1 Stmt. ¶¶ 524, 761, 767, because he was concerned about retaliation, *id.* ¶¶ 566, 767, 770, 774.  Regardless of the true motive, the tapes provide a contemporaneous record of many of the conversations on which Plaintiff relies in this case.

[10]     On the same day as Plaintiff's conversation with Hantho, Plaintiff spoke to Richard Gibb, the Global Co-head of FIG Coverage, about the move.  During their conversation, Gibb seemed to agree that Hantho thought the move was urgent.  *See* Conversation Tr., Dkt. 75-22 at 2; Def. 56.1 Stmt. ¶ 100.

Defendants assert that Abromavage complained that the momentum behind his move had slowed before Gurandiano's termination, which they claim demonstrates that this adverse employment action was not a result of retaliation.  Def. Mem. of Law at 21, n.15.  But Defendants' argument is based entirely on Abromavage's statement during an October 14, 2015, conversation, in which he said, "there was a lot of urgency in June and July [about moving positions] and then it stopped and then [Gurandiano] got fired . . . ."  Conversation Tr., Dkt. 59-14 at 1; Def. 56.1 Stmt. ¶ 124.  Viewing the evidence in the light most favorable to Abromavage, a finder of fact could credit his explanation that "although 'conversationally, that may have been how it came out,' it is not 'appropriately characterized' to say that the urgency stopped before Gurandiano . . . [was] terminated."  Def. 56.1 Stmt. ¶ 124 (Pl. Resp.) (citing Pl. Dep. at 360:13-25).  Accordingly, for purpose of the summary judgment motion, the Court will assume that a jury would resolve this dispute in Plaintiff's favor and find that this alleged adverse employment action occurred on August 3, 2015.

The parties further dispute when the decision was made not to award Abromavage a bonus for the year 2015.  Abromavage claims that Bunzel and Hantho decided to reduce Abromavage's 2015 annual bonus to zero on December 11, 2015, eight days after Hantho was interviewed and three days after Bunzel was interviewed as part of DBSI's investigation into Abromavage's complaints of retaliation.  Pl. Resp. at 8.  Defendants argue that the decision occurred at some point before Hantho was interviewed.  In support, they cite an email exchange between Ed Kwan and Amelia Silver, two DBSI employees who did not have substantive input into bonus decisions but who oversaw the internal DBSI bonus spreadsheets.  In an email sent at 7:20 a.m. on December 3, 2015, which was before regular business hours and therefore likely before Hantho was interviewed that day, Silver informed Kwan that Abromavage's proposed

2015 bonus was zero.  Def. Reply at 4; Pl. 56.1 Stmt. ¶¶ 739–740 (Def. Resp.).  This means that Hantho and Bunzel, who determined Abromavage's bonus, *see* Def. 56.1 Stmt. ¶ 209 (undisputed), must have told Silver that Abromavage was not going to get a bonus at some point prior to December 3, 2015 at 7:20 a.m.  Neither party offers evidence about when HR scheduled the interviews with Hantho or Bunzel or, more generally, specifically when they learned that Abromavage had complained about retaliation.  With no additional evidence, a reasonable factfinder could only conclude that the decision not to award a bonus to Abromavage occurred at some point after Defendants learned of his participation in the Gurandiano investigation but before they learned that he had complained about retaliation.

The timeline of the relevant events (viewing the evidence in the light most favorable to Plaintiff), with the dates Defendants learned about the alleged protected activities in bold, follows:

- **July 24, 2015: Hantho and Bunzel learn about Abromavage's participation in the Gurandiano investigation.  Pl. Resp. at 5.**

- Late July 2015: Defendants remove revenue from SPACs transactions from the revenue attributable to Abromavage.  Pl. Resp. at 8, n.5.

- August 3, 2015: Defendants decide not to approve Abromavage's move to a new position in FIG coverage.  Pl. Resp. at 7.

- August 2015: Defendants reassign Abromavage's clients to other groups.  Def. Mem. of Law at 23; Abromavage Decl. ¶ 77.

- September 2015: DBSI refuses to fund Abromavage's attendance at a DBSI technology conference in Las Vegas.  Def. 56.1 Stmt. ¶ 336 (undisputed).

- October 13, 2015: Abromavage is forced to play a more limited role in a meeting with Apollo, a DBSI client. *Id.* ¶ 181.

- October/November 2015: DBSI refuses to fund Abromavage's attendance at the Money 20/20 conference.  Def. 56.1 Stmt. ¶ 341 (undisputed).

- Early December 2015: Defendants set Abromavage's 2015 annual bonus at zero.  Def. Reply at 4.

- **December 3, 2015: Hantho and Eydenberg are interviewed by HR about Abromavage's complaints of retaliation, Pl. 56.1 Stmt. ¶¶ 659, 671 (undisputed), alerting them to Abromavage's retaliation complaints.**

- **December 8, 2015: Bunzel is interviewed by HR about Abromavage's complaints of retaliation, Pl. 56.1 Stmt. ¶ 676 (undisputed), alerting him to Abromavage's retaliation complaints.**

- December 23, 2015: Abromavage receives a negative performance review.  Pl. Resp. at 9; Pl. 56.1 Stmt. ¶¶ 689–690.

- August 4, 2016: Abromavage is terminated from DBSI.  Def. 56.1 Stmt. ¶¶ 272, 278; Pl. 56.1 Stmt. ¶ 774.

As this timeline demonstrates, five of the seven alleged adverse employment actions occurred within two to three months of the dates that Defendants learned of Abromavage's alleged protected activity.  The decision to award Abromavage no bonus for 2015 was made more than four months after Hantho and Bunzel allegedly learned that Abromavage participated in the Gurandiano investigation and Abromavage was terminated eight months after the last protected activity of Abromavage about which there is evidence Defendants were aware.  Both events are beyond the three-month outer limit.  *Percy*, 264 F. Supp. 3d at 586.

But in evaluating temporal proximity, courts must consider whether there is "any aspect of the facts alleged which could explain such a delay." *Hurd v. N. Y. Health & Hosps. Corp.*, No. 04-CV-998, 2007 WL 678403, at *6 (S.D.N.Y. Mar. 5, 2007), *aff'd sub nom. Hurd v. N. Y. C. Health & Hosps. Corp.*, No. 07-CV-1250, 2008 WL 5120624 (2d Cir. Dec. 8, 2008). *See also Curcio v. Roosevelt Union Free Sch. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (finding a long gap did not negate temporal proximity because the alleged negative reviews occurred at the next regularly scheduled evaluation); *Quinby v. WestLB AG*, No. 04-CV 7406, 2007 WL 1153994, at *13 (S.D.N.Y. Apr. 19, 2007) (collecting cases).[11]

Both the termination and the bonus decision occurred on a corporate timetable.  As to the bonus, it is reasonable to conclude that DBSI sets bonuses annually, and, based on the evidence in the record, it appears that occurs towards the end of the calendar year.  Thus, although there was a lengthy delay between Abromavage's participation in the Gurandiano investigation and him being designated to receive no bonus, the Court finds that a reasonable factfinder could conclude that, despite that delay, the protected activity was the cause of him not receiving a bonus in 2015.  The end of the year was simply the soonest that action could occur.

With respect to his termination, Abromavage's proffered reason explains the delay, meeting the *prima facie* causation standard.  The parties agree that reductions in force ("RIF") at

---

[11]     Abromavage also argues that the long delay "should not be considered in isolation, but must instead be analyzed in the context of the pattern of antagonism that followed Plaintiff's first whistleblower interview. . . ."  Pl. Resp. at 17–18.  To support this contention, Abromavage cites *Duplan v. City of New York*, which, he argues, stands for the proposition that a pattern of antagonism can explain significant delays between protected activities and retaliatory adverse employment actions.  *Id.* (citing *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018)).  Abromavage misapplies *Duplan*.  In that case, the plaintiff alleged a series of adverse actions that occurred one after the other, which the Second Circuit found established a "backdrop of continuing antagonism."  *Duplan*, 888 F.3d at 626.  There are no analogous facts here; Abromavage does not allege that any additional adverse employment actions occurred between his negative performance review and termination, let alone a series of adverse actions.  Moreover, at issue in *Duplan* was whether the plaintiff had alleged a *prima facie* case that could survive a motion to dismiss, a much lower standard than the four-part *prima facie* test used at the summary judgment stage.  Accordingly, while patterns of antagonism may explain breaks in temporal proximity, that is not a relevant consideration here.

DBSI occurred on set dates, with one occurring in March 2016 and another in August 2016.  Def. 56.1. Stmt. ¶ 264; Pl. 56.1 Stmt. ¶ 775.  A factfinder could certainly credit Abromavage's explanation that he was not included in the March 2016 RIF because "Hantho intended to compel Plaintiff's resignation by giving him a zero bonus, which is the message sent in the financial industry with a zero bonus."  Pl. Resp. at 19.  After Abromavage did not resign, he was included in the next RIF.  *Id.*  Accordingly, even though the termination occurred eight months after the last alleged protected activity of which Defendants were aware, a rational jury could find that the action was caused by the protected activity.

In short, the temporal proximity of five of the alleged adverse employment actions to the time Defendants learned of the alleged protected activities and the alternative explanation for the delay in zeroing out his bonus and terminating Abromavage are enough to establish proof of causation at the *prima facie* stage for those actions.  Accordingly, Abromavage has established a *prima facie* case.

### C.   Defendants Have Articulated Legitimate, Non-Retaliatory Reasons for the Adverse Employment Actions and Plaintiff Has Not Demonstrated that the Reasons are Pretextual

Although the Court has assumed that Abromavage has established a *prima facie* case of retaliation, summary judgment in favor of Defendants is appropriate because "the record conclusively revealed some other, nondiscriminatory reason[s] for the employer's decision[s]." *Karimian v. Time Equities, Inc.*, 569 F. App'x 54, 54–55 (2d Cir. 2014) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)).

### 1.   Abromavage's Declining Revenue Is a Legitimate, Non-Retaliatory Reason for Four of the Alleged Adverse Employment Actions

Defendants argue that Abromavage's declining revenue justified four of the alleged adverse employment actions: no bonus in 2015, a subpar performance review, refusal to fund

attendance at conferences, and termination.  *See* Def. Mem. of Law at 16 (Abromavage was not awarded a bonus in 2015 "because FIG ECM had been declining, and that decline was projected to continue."); Def. Reply at 10 (Abromavage's "year-over-year revenues had declined by 70%, and [Bunzel] rated Plaintiff's performance accordingly.");[12] Pl. 56.1 Stmt. ¶ 615 (Def. Resp.) ("It made less sense for the Bank to pay for expensive conferences when Plaintiff was not bringing in significant revenue.");[13] Def. Reply at 1 ("In August 2016, facing even worse revenues and business prospects, Plaintiff's job was eliminated.").

Financial distress and declining revenues are legitimate, non-retaliatory reasons for adverse employment actions.  *See Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467, 2015 WL 5692860, at *27 (E.D.N.Y. Sept. 28, 2015) (collecting cases).  In this case, even when viewing the evidence most favorably for Plaintiff, there is no question that Abromavage's revenue was way down in 2015.  Abromavage's franchise value, the total fees he realized for the firm, was $18.3 million in 2015.  Those fees were considerably lower than fees he realized in prior years: $93.3 million in 2014, $45.8 million in 2013, and $98.5 million in 2012.  Def. 56.1 Stmt. ¶ 219; Rev. Chart, Dkt. 75-13 at 1.  Abromavage's production revenue credits ("PRCs"), which is the percentage of the franchise value directly attributable to his contribution, were

---

[12]    With respect to Abromavage's performance review, Defendants also contend that they lowered his rating because of his failures at collaboration, a concern that had been noted in prior performance reviews.  Def. Mem. of Law at 8.  Abromavage's 2013, 2014, and 2015 performance reviews each indicate that Abromavage could have better coordinated with other teams.  Def. 56.1 Stmt. ¶¶ 203–05.  Abromavage responds by arguing that the only specific instances of partnering issues identified by Defendants are those related to interactions with Gurandiano or to Bunzel's retaliation.  Pl. Resp. at 23.  But even if Gurandiano or Bunzel's responses to Abromavage's actions were disproportionate or inappropriate, that does not negate the fact that Abromavage may also have behaved unprofessionally.

[13]    In response, Abromavage noted that hundreds of DBSI employees attend such conferences and that he had never before been instructed not to attend a conference due to cost constraints.  Def. 56.1 Stmt. ¶ 339 (Pl. Resp.).  But this argument misses the point.  DBSI is not contending that it could not afford to send Abromavage to these conferences; instead, DBSI claims it was not cost effective given the decline in revenue attributable to Abromavage.

similarly down in 2015.  His 2015 PRC was $13.8 million, compared to $45.9 million in 2014, $24.1 million in 2013, and $39 million in 2012.  Pl. 56.1 Stmt. ¶ 363; Rev. Chart at 1.

Abromavage claims that his 2015 revenues were artificially depressed by the reallocation of SPACs revenue away from him.  Pl. 56.1 Stmt. ¶ 373.  But even assuming Abromavage would have earned as much in SPACs revenue in 2015 as he earned in 2014 had he continued to be credited with that revenue, his franchise value would only increase to about $25 million, which is still a drastic decline from prior years.  Rev. Chart at 1.[14]  Moreover, even if all of Eric Hackel's 2015 SPACs franchise value were added to Abromavage's 2015 franchise value, Abromavage's total franchise value would still be considerably lower than in past years.[15]

Abromavage offers detailed explanations for the decline in his revenue.  He argues that FIC ECM revenue decreased "largely as a result of the interest/credit rates cycle in the US economy and their effect on financial services."  Abromavage Decl. ¶ 123.  He also notes that "declines in revenue in any given year are more of a function of market volatility than any one structural relationship to broader economic conditions."  Pl. 56.1 Stmt. ¶ 367.  Defendants offer a competing theory: FIG ECM revenue declined because financial institutions did not need to raise capital at the same levels following the economy's recovery after the 2008-12 recession.  Def. Mem. of Law at 3.  But even assuming Abromavage's explanation is correct, which the Court

[14]    The same is true for Abromavage's PRCs.  Even if Abromavage's PRC value from SPACs in 2014 were added to his total PRC in 2015, Abromavage's 2015 PRC would only increase to about $16 million, which is substantially lower than previous years.  Rev. Chart, Dkt. 75-13 at 1.

[15]    In 2015, Hackel's SPAC-related franchise value was $21.9 million, more than double Abromavage's SPACs-related franchise value in 2013, which was Plaintiff's best year for SPACs.  Rev. Chart at 1.  But even when $21.9 million is added to Abromavage's 2015 franchise value, his total franchise value increases only to $40.2 million, which is less than half of his franchise value in 2014 and is lower than his franchise value for each of the prior four years.

must given the summary judgment standard, that does not alter the fact that, whatever the cause, Abromavage's 2015 revenues were in free fall.[16]

Moreover, there is no dispute that Plaintiff's revenues continued a downward trajectory in 2016. As of May 2016, Plaintiff's franchise value for the year to date was only $2.6 million and his personal revenue credits were only $1.9 million. Rev. Chart at 1; Pl. 56.1 Stmt. ¶ 772 (Def. Resp.). Even considering that those statistics reflect only five months of revenue, those numbers are a marked decrease from 2015, his previous worst year. Abromavage argues that he spent much of 2016 addressing the fallout from the departure of his co-head at FIG ECM. Abromavage Decl. ¶ 139. But here too, Abromavage's explanation for the downward trend does nothing to address the undisputed fact that his revenue was at a dismal level and only getting worse.

Defendants also argue that Abromavage was redundant, another legitimate and non-retaliatory reason for terminating him. *See Grasso v. EMA Design Automation, Inc.*, 618 F. App'x 36, 37 (2d Cir. 2015) (finding that the ability to "operate efficiently without plaintiff's position" was a legitimate reason for termination). In 2015, FIG ECM consisted of two managing directors (one of whom was Abromavage), a vice president, and two analysts. Def. 56.1 Stmt. ¶ 19. When Abromavage's co-head left DBSI, he was not replaced. *Id.* ¶ 20. Moreover, after Abromavage was terminated, DBSI did not replace him, and it subsequently disbanded FIG ECM as a standalone group. Def. Mem. of Law at 5, 16; Def. Reply at 1; Def. 56.1 Stmt. ¶¶ 273–275. In 2017, DBSI further reduced the number of people working on FIG ECM. Def. 56.1 Stmt. ¶¶ 276–277. In short, Abromavage's low revenue and DBSI's decision to

---

[16]     Abromavage also argues that FIG ECM at DBSI outperformed FIG ECM in the financial industry more broadly. Pl. 56.1 Stmt. ¶ 702. But even if Abromavage is right that DBSI's FIG ECM ship was sinking more slowly than those of other banks, that does not negate the fact that his ship was still headed underwater.

reduce the number of personnel working on FIG ECM are legitimate, non-retaliatory reasons for the adverse actions about which Abromavage complains.

In an attempt to prove that Defendants' reasons are pretextual, Abromavage argues that Defendants have offered contradictory explanations for why he did not receive a bonus and why he was terminated. Abromavage challenges the truthfulness of Defendants' contention that Jeffrey Urwin, the head of investment banking, directed Hantho to give no bonus to "20 percent . . . or thereabouts" of ECM managing directors and later to reduce ECM's headcount by 20 percent. Hantho Dep., Dkt. 82-1 at 611:4-612:8; Def. Mem. of Law at 5, 16. The existence of such directives would be entirely consistent with the undisputed overall financial picture: FIG ECM revenue was down. Under those circumstances, it would make sense for management to reduce bonuses and terminate personnel.[17] Moreover, Abromavage's argument that Defendants presented little documentary evidence about these directives does not create a material question of fact. Defendants assert that the bonus directive was given orally, which is why there was little documentation. Hantho Dep. at 427:18-25. With respect to terminations, Defendants produced an email from Hantho to Urwin and others in which Hantho referenced a "very aggressive headcount reduction;" that email is some documentary evidence of the existence of a directive to reduce headcount. Email, Dkt. 76-1 at 1. In contrast, Plaintiff has no evidence that there was no such directive.

---

[17]   Abromavage further argues that Hantho and Bunzel gave "directly contradictory accounts" at their depositions about the zero-bonus decision. Pl. Resp. at 3. But even construing the facts in the light most favorable to Abromavage, there was no contradiction. Abromavage is right that it was only on the second day of his deposition that Bunzel testified that there was pressure to give some employees no bonus and that this followed Hantho's own testimony about the Urwin directives. Pl. Resp. at 20, n.18. But putting aside the fact that the day on which testimony is given is rarely critical, Bunzel testified on the first day of his deposition that "FIG performance was down very significantly from prior years," Bunzel Dep., Dkt. 82-2 at 374:2-6, a fact which supports the existence of such a directive. Moreover, even though Bunzel testified that he did not speak to HR or the legal department about awarding some employees no bonus, Bunzel Dep. at 371:2-8, that does not contradict Hantho's testimony that Urwin, who worked in neither HR nor in legal, gave such a directive.

Abromavage further argues that Urwin could not have given the alleged bonus directive because it would have been inconsistent with DBSI policy, which requires "both quantitative and qualitative measures to assess performance." Pl. Resp. at 20. But the purported directive did not violate DBSI policy; in choosing for whom there would be no bonus, Hantho asserts that, consistent with DBSI policy, he considered quantitative and qualitative measures. Def. 56.1 Stmt. ¶ 238.[18] Abromavage is correct when he argues that the four other ECM managing directors who received no bonus in 2015 were not similarly situated to him. Def. 56.1 Stmt. ¶ 231 (Pl. Resp.); Pl. Resp. at 3, 21 n.19. But whether they were similarly situated is irrelevant when the directive was to zero-out the bonuses of approximately 20% of the group. Def. Reply at 8. Moreover, the fact that fewer than 20% of ECM Managing Directors received no bonus and that fewer than 20% were fired does not support Plaintiff's argument that the directives were never given — it simply demonstrates that they were not fully implemented.[19] Pl. Resp. at 3, 10, 20–21. In short, given the declining revenue and undisputed redundancies, it makes sense that Hantho would have been directed to reduce bonuses and terminate personnel from ECM. Although Abromavage quarrels with the logic, he has presented no evidence to contradict Hantho's testimony or from which a jury could conclude that Hantho's reasoning was pretextual vis-à-vis its impact on Abromavage.

---

[18]     For example, Defendants noted that Abromavage's base pay was relatively high, meaning that his $0 bonus would not be as financially problematic for him as it might be for lower paid employees. Def. Mem. of Law at 16. Abromavage responds by noting that his total compensation was lower than all but 3 of the 15 managing directors in ECM Americas. Def. 56.1 Stmt. ¶ 241 (Pl. Resp.). That argument is not compelling; Defendants assert that Abromavage's base pay was a factor in deciding not to award him a bonus, not that he was particularly well paid compared to other managing directors.

[19]     Moreover, Hantho explained that the directive concerned reducing headcount overall. Accordingly, individuals who left voluntarily, like Abromavage's former FIG ECM co-head, Jeffrey Mortara, were included in the twenty percent. Def. Reply at 9; Pl. 56.1 Stmt. ¶ 779 (Def. Resp.). Thus, even if the extent to which the directive was implemented were a relevant concern, it appears to have been implemented to a larger extent than what Abromavage contends.

2.    **Personnel Changes Were Legitimate Reasons for Two of the Alleged Adverse Employment Actions**

Defendants argue that they did not approve Abromavage's proposed move to FIG coverage and that they reallocated SPACs revenue away from him because of internal personnel changes.  With respect to the move to FIG coverage, Abromavage asserts that although the move was almost finalized, it was ultimately not approved to retaliate against him for his participation in the Gurandiano investigation.  Pl. Resp. at 22; Pl. 56.1 Stmt. ¶ 519.  He asserts that the "primary obstacle" to the move had been the difficulty of working alongside Gurandiano; once Gurandiano had been terminated, according to Plaintiff, the move should have been finalized. Pl. Resp. at 22; Abromavage Decl. ¶ 61.

But Abromavage's argument ignores the fact that Gurandiano's termination was not the only personnel change that occurred at that time.  Niron Stabinsky, a FIG coverage banker, was fired the same week as Gurandiano.  Abromavage Decl. ¶ 59.  Additionally, Richard Gibb, the global co-head of FIG coverage and Abromavage's would-be supervisor in the new role, was on his way out.  Def. 56.1 Stmt. ¶¶ 103, 114.  Facing the vacancies left by Gurandiano and Stabinsky and the impending departure of Gibb, Bunzel told Abromavage on August 3, 2015, "you've got to accept [that] new management's got to step back and assess the whole thing considering that these are two really critical areas of business in a lot of different ways," Conversation Tr., Dkt. 75-29 at 2, a position with which Abromavage concurred, *id*.  Hantho had also foreshadowed that Gibb's departure could be a problem for Abromavage's move during their July 6, 2015, conversation, weeks before Abromavage participated in the Gurandiano investigation.  At that time, Hantho said to Abromavage: "I kind of put a little urgency to this because I do think that if it's absent and Gibb leaves his job, that whole section will be open to auction to the public market so to speak, and your opportunity will — on that particular

opportunity — will fade away."  Conversation Tr., Dkt. 75-28 at 13.  Hantho's prediction is

exactly what happened.  With Gurandiano and Stabinsky gone, and Gibb almost out the door,

management delayed making any major FIG coverage personnel decisions, including

Abromavage's proposed move.  DBSI instead hired Celeste Guth to replace Gibb, and she

ultimately hired two employees with more experience than Abromavage.[20]  Def. Mem. of Law at

7–8.

      Abromavage argues that such personnel changes could not be the reason he was denied

the role because the "length of time it takes to off-board and replace someone of Gibb's

seniority, together with whatever garden leave obligations his replacement might have, means it

is typically not practical to keep a seat open until the Group Head's replacement is installed."

Abromavage Decl. ¶ 69.  But Plaintiff's argument on practicalities belies what indisputably

happened.  As Abromavage notes, Guth was performing duties for DBSI during her garden

leave.  Def. 56.1 Stmt. ¶ 148 (Pl. Resp.).  Those duties included speaking to Abromavage in

November 2015, in part about his desire to move to FIG coverage.  Pl. Dep. at 378:18-380:19.

That Guth ultimately chose to hire more qualified applicants to fill the open roles further

demonstrates that Defendants had legitimate reasons for not approving Abromavage's move to

FIG coverage given the changing circumstances.[21]

---

[20]     It is unclear exactly when Guth was hired.  The parties note that Guth started in March 2016, after completing a six-month garden leave.  Def. 56.1 Stmt. ¶ 148.  That suggests that she was hired in or around September 2015.

[21]     The Court declines to consider Defendants' second explanation for why the move never materialized: that Abromavage remained uncertain about whether he wanted the position.  Def. Mem. of Law at 7, 20.  Defendants assert that Plaintiff wanted compensation guarantees before making the move.  *Id.* at 7.  Abromavage also claims that he was concerned about having to work alongside Gurandiano and Stabinsky.  Pl. Resp. at 6, 22; Abromavage Decl. ¶ 47.  But Abromavage's salary concerns were alleviated in June or July 2015 when he received assurances that he would make $2 million in the new role.  Def. 56.1 Stmt. ¶ 123 (undisputed).  And with Gurandiano and Stabinsky's terminations, his concerns about working alongside them disappeared.  While these issues could explain why Abromavage did not move to the new job before July 2015, viewing the evidence in the light most favorable to Abromavage, uncertainty about his desire for the job cannot explain why the move did not occur in the months following July 2015.  Accordingly, although the reason is not internally inconsistent or contradictory, viewing the

With respect to the reallocation of SPACs revenue, Defendants argue that they "reorganized the SPAC business" by moving Eric Hackel to ECM — a move that occurred on May 1, 2015.  Def. Mem. of Law at 19.  Hackel had received an offer from another bank, and DBSI did not want to lose him.  DBSI could pay him more by moving him to ECM, which succeeded in keeping him at DBSI.  *Id.*  Given the timing, Hackel's move to ECM could not have been retaliatory.  Defendants contend that the move had been in the works for months and was finalized on May 1, 2015, weeks before Abromavage was interviewed as part of the Gurandiano investigation.  Def. Mem. of Law at 6–7.  Abromavage asserts that, notwithstanding Hackel's move to ECM, it was retaliatory for SPACs revenue to be taken away from him and allocated directly to Hackel, especially because other bankers had worked on SPACs in the past but Abromavage had always been credited with the revenue.  Pl. Resp. at 22–23.  Accepting Plaintiff's argument as true, that does not mean that DBSI was required to maintain that allocation in perpetuity.  Defendants assert that Abromavage had previously received SPACs credit because the coverage bankers who worked on SPACs sat in FIG.  Pl. 56.1 Stmt. ¶ 590 (Def. Resp.).  Hackel's move to ECF changed that dynamic.[22]  Accordingly, Defendants have met their burden to supply a legitimate, non-retaliatory reason for changing how SPACs revenue was allocated, and Plaintiff has not presented any evidence from which a jury could conclude that those reasons were pretextual.

---

evidence in the light most favorable to Abromavage, it cannot explain the decision not to move him after Gurandiano was fired.

[22]  This changing dynamic is further reflected in the dramatic increase in SPACs revenue precipitated by Hackel's move to ECM.  In 2013, Abromavage's best year for SPACs revenue, his franchise value attributable to SPACs was about $9.3 million.  Rev. Chart at 1.  But in 2015, Hackel's franchise value attributable to SPACs was about $21.9 million, more than double Abromavage's best year.  Given this dramatic increase, it was reasonable for DBSI to have reassessed how SPACs revenue should be allocated.

### 3.   Defendants Had a Legitimate Non-Retaliatory Reason for Limiting Abromavage's Role with Some Clients

Abromavage asserts that Hantho and Bunzel limited his role with certain clients to retaliate against him for his protected activities.  Pl. Resp. at 24; Def. 56.1 Stmt. ¶¶ 160–61 (undisputed).  Defendants explain that they re-positioned some of the referenced clients as technology companies, rather than financial institutions, so that they could be more readily marketed to investors and receive higher valuations.  Def. Mem. of Law at 23.  Defendants contend that other referenced clients were real estate businesses that more naturally fit in ECM's Real Estate Gaming, Lodging, and Leisure ("REGLL") group, which had more real estate experience than FIG.  Def. 56.1 Stmt. ¶ 168; Pl. 56.1 Stmt. ¶ 606 (Def. Resp.).

Abromavage disagrees with these reasons; he argues that it was unnecessary to exclude FIG in order to achieve a higher valuation by marketing a company as "fintech."  Abromavage Decl. ¶ 79.  He also disagrees that REGLL should have handled the real estate businesses; he asserts that the transactions "were not 'real estate deals,' but instead financial services deals involving real estate companies."  Pl. 56.1 Stmt. ¶ 606.  But none of Abromavage's arguments demonstrates that DBSI's reasons are false; he simply disagrees with the judgment of his employer.  Needless to say, an employee's quarrel with an employer's decision does not undercut the legitimacy of the rationale for the decision, nor does it establish pretext.  *See Peters v. Mount Sinai Hosp.*, No. 08-CV-7250, 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989)) ("[C]ourts have consistently held that they may not second-guess an employer's non-[retaliatory] business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by [retaliation]."); *see also White*, 973 F. Supp. 2d at 382–83; *Gaffney v. Dep't of Info. Tech. & Telecomm.*, 536 F. Supp. 2d 445, 469 (S.D.N.Y. 2008).

The parties discuss the client Apollo at some length, but the Apollo incident only further underscores the extent to which Abromavage and his supervisors did not see eye to eye on organizational structure and client strategy. The parties agree that in October 2015 Abromavage received a second-hand invitation to a meeting with Apollo from another banker (i.e., Plaintiff's invitation did not come from the meeting's organizer). Def. 56.1 Stmt. ¶ 181 (undisputed). While that banker thought it was important for Abromavage to attend the meeting, Bunzel, Abromavage's boss, disagreed. Bunzel viewed the meeting as an opportunity to highlight Hackel's SPAC work. *Id.* ¶ 182. Following the meeting, Abromavage sent an email to the client, introducing key players and describing his own role. *Id.* ¶ 186. Abromavage and Bunzel disagreed about whether the email was appropriate. Bunzel felt Abromavage was wrong not to copy Bunzel or Richard Park, who led the overall team, while Abromavage argued that he did not intend to include people at the "very high level" on the email. *Id.* ¶ 187. Bunzel also believed that Abromavage was showboating when he characterized Hackel's role, because it implied that SPAC was a subset of FIG ECM, which was no longer the case. *Id.* ¶¶ 188, 191. In response to Abromavage's email to the client, Bunzel sent Abromavage an email: "You have no business sending that email to [the client] after a meeting that you tagged on to. There is too much involved that you don't even know about. Inappropriate and inexplicable." Email, Dkt. 57-2. The email was undoubtedly a rebuke. Def. 56.1 Stmt. ¶ 192 (Pl. Resp.) (noting that Hantho described Bunzel's email as "a little aggressive" and asked Abromavage to "clear the air").

While the Court agrees that Bunzel's email could have been more diplomatic, it does not demonstrate retaliation. Instead, it simply evidences the disconnect that existed between Abromavage and his supervisors. Abromavage disagreed with the role he had been given with

Apollo, and he appeared to disagree with Hackel's place in the DBSI organizational structure. But disagreement or not, Abromavage has not demonstrated that Defendants' explanations for limiting his role with Apollo or any other client were false or pretextual. In short, DBSI has established that it had legitimate and non-retaliatory reasons to limit Abromavage's role with certain clients, including Apollo, and Plaintiff has not presented any evidence from which a factfinder could conclude that any of those reasons were pretextual.

### D.   Abromavage Cannot Show that Retaliation Was a But-For Cause of the Adverse Employment Actions

At the final stage of the *McDonnell Douglas* framework as it applies to retaliation cases, a plaintiff must show that "retaliation was a 'but-for' cause of the adverse action[s], and not simply a 'substantial' or 'motivating' factor in the employer's decision[s]." *D'Andrea*, 765 F. App'x at 605 (citing *Zann Kwan*, 737 F.3d at 845 and *Nassar*, 570 U.S. at 348). As discussed in the previous section, DBSI has proffered legitimate, non-retaliatory, and non-pretextual reasons for the adverse employment actions.[23] But "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability." *Zann Kwan*, 737 F.3d at 846, n.5. A plaintiff is not required to demonstrate "that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846.[24] Abromavage argues that Defendants' friendship with and their

---

[23]    "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). But, as discussed at length in the previous section, even when the facts are construed in the light most favorable to him, Abromavage is unable to demonstrate that Defendants' proffered reasons for the adverse employment actions are weak, implausible, inconsistent, or contradictory.

[24]    Unlike at the *prima facie* stage, temporal proximity alone is not enough to make this showing. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 72 (2d Cir. 2015); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014).

history of protecting Gurandiano demonstrate that they harbored retaliatory animus and that

retaliation is, therefore, a but-for cause of the adverse employment actions he experienced.  Pl.

Resp. at 1.[25]

> **1.    Abromavage Has Shown that Hantho and Eydenberg Were Friends of Gurandiano, But That Is Insufficient to Demonstrate But-For Causation**

In the light most favorable to Abromavage, he has demonstrated that Hantho and

Eydenberg were friendly with Gurandiano.[26]  Notes from various HR interviews suggest that

Hantho had a friendly relationship with Gurandiano.  During his own interview as part of the

Gurandiano investigation, Hantho allegedly stated that felt he could help Gurandiano because he

could understand him and his background "based on shared city of Montreal."  Pl. 56.1 Stmt. ¶

486.  During Hantho's December 3, 2015, interview as part of the investigation into

Abromavage's complaints of retaliation, Hantho allegedly said that he was Gurandiano's mentor

and that he had tried to keep him in line.  Pl. 56.1 Stmt. ¶¶ 486, 662.  Moreover, notes from

interviews with four other DBSI employees as part of the Gurandiano investigation show that

Hantho and Gurandiano shared Canadian roots, that the two were friendly, and that they both

enjoyed hockey.  Pl. 56.1 Stmt. ¶ 490 (quoting HR's notes from interviews with Jeffrey Mortara,

Paul Wetzel, Richard Gibb, and Niron Stabinsky).  In contrast, Defendants argue that Hantho did

---

[25]    Abromavage also argues that Eydenberg retaliated against Mortara, Plaintiff's former co-head at FIG ECM, by denying him a more significant role at DBSI.  Pl. Resp. at 3, 7–8.  As evidence of this retaliation, Mortara claims that after Gurandiano's termination, Eydenberg said to Mortara, "assume I know all" about "what was said in the investigation."  Pl. 56.1 Stmt. ¶ 497.  Defendants dispute this account, Def. Mem. of Law at 15, n.14, but for the purpose of this motion, the Court accepts that those statements were made as Plaintiff contends.  But even so, those statements are insufficient to demonstrate that retaliation was a but-for cause of any adverse employment action experienced by Mortara, let alone by Abromavage.  Even if Eydenberg told Mortara that he was aware of what happened in the Gurandiano investigation, it requires way too many inferences to get from there to the conclusion that retaliation was a but-for cause of the adverse employment actions suffered by Abromavage.  Accordingly, such evidence does not meet the but-for causation standard required at this stage of the *McDonnell Douglas* framework.

[26]    Abromavage does not claim that Bunzel was especially friendly with Gurandiano.  He does not dispute that Bunzel did not socialize or travel with Gurandiano.  Def. 56.1 Stmt. ¶¶ 319–321 (undisputed).  He also limits his discussion about alleged friendships with Gurandiano to Hantho and Eydenberg.  *See, e.g.*, Pl. Resp. at 5, n.3.

not have a close relationship with Gurandiano: they only watched one hockey game together and other coworkers were also present; they had never been to each other's homes; and their only travel together was for business and did not involve socializing.  Pl. 56.1 Stmt. ¶ 490 (Def. Resp.).  But in the light most favorable to Abromavage, a reasonable juror could conclude that Hantho and Gurandiano were friends.

There is a question of fact whether Gurandiano was friends with John Eydenberg, Gurandiano's indirect supervisor.  Notes from Eydenberg's interview during the Gurandiano investigation state that both he and Gurandiano vacationed in Vail and that they had seen each other in the Hamptons.  Pl. 56.1 Stmt. ¶ 487; Def. 56.1 Stmt. ¶ 81 (Pl. Resp.).[27]  Eydenberg argues that this does "not reflect personal knowledge of any friendship."  Pl. 56.1 Stmt. ¶ 490 (Def. Resp.).  He also denies socializing with Gurandiano outside of work and notes that while he may have seen Gurandiano when they were both separately on vacation, he "never spoke to him for more than 45 seconds."  *Id.*  Viewing the evidence in the light most favorable to Abromavage, a reasonable juror could conclude that Eydenberg and Gurandiano were friends.

But friendship, without more, is insufficient to demonstrate that there was retaliatory animus, let alone that retaliation was a but-for cause of the adverse employment actions.  In *Davis v. Ashcroft*, an INS agent alleged that he was denied a promotion "in retaliation for providing an affidavit adverse to a friend and colleague of  . . . the decision-maker responsible for the promotion decision."  57 F. App'x 968, 968–69 (3d Cir. 2003).  The Third Circuit found that this was insufficient to meet the *prima facie* causation standard, *id.* at 972, which is considerably less strict than the but-for causation standard used at the final stage of the

---

[27]     Notes from interviews of Mortara and Gibb state that Eydenberg and Gurandiano had gone skiing together in Colorado and that they spent time together in the Hamptons.  Pl. 56.1 Stmt. ¶ 490; Def. 56.1 Stmt. ¶¶ 304, 311 (Pl. Resps.)

*McDonnell Douglas* framework.  Similarly, in the discrimination context, courts have found that friendship between a decision-maker and an allegedly racist employee is insufficient to impute discriminatory animus to the decision-maker at the *prima facie* stage.  *See, e.g.*, *Cope v. Wal-Mart Stores E., LP*, No. 15-CV-1523, 2017 WL 2802722, at \*11 (D. Conn. June 28, 2017); *Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 82 (E.D.N.Y. 2009); *Brown v. AstraZeneca Pharm., L.P.*, No. 03-CV-6166, 2006 WL 2376380, at \*8 (E.D.N.Y. Aug. 16, 2006).  Accordingly, when evaluating but-for causation, a more stringent causation standard than that at the *prima facie* stage, the fact that Hantho and Eydenberg were friendly with Gurandiano proves only that and nothing more.

### 2.   Abromavage Is Unable to Establish that Defendants Had a History of Protecting Gurandiano

Abromavage claims that Hantho, Bunzel, and Eydenberg had a history of protecting Gurandiano and that history is evidence that they had a retaliatory animus that caused them to retaliate against Abromavage for participating in the investigation of Gurandiano.  *See* Pl. Resp. at 1 (noting that "powerful Bank executives," including Hantho, Bunzel, and Eydenberg, "repeatedly shielded" Gurandiano from any consequences of bad behavior); *id.* at 5 (referring to "Gurandiano's protectors"); *id.* at 7 (referencing the "history of Hantho, Bunzel and Eydenberg protecting Gurandiano").  Putting aside that the argument is not logical, Plaintiff has no evidence of the premise, to wit: that Defendants had a history of protecting Gurandiano.  To prove the premise, Abromavage provides three examples: the Black Knight dispute, the SoFi incident, and the Gurandiano investigation itself.  Upon careful review, even in the light most favorable to Abromavage, none of these events demonstrates that Defendants protected Gurandiano.  Moreover, even if they did, Abromavage cannot show that any prior history or protection means that retaliation was a but-for cause of any adverse employment action.

The Black Knight dispute refers to a series of emails sent in November 2014, many months before any of the alleged protected activity.  In the first email exchange, Gurandiano and Stabinsky, a FIG coverage banker, disagreed about whether Gurandiano's team should be involved in a meeting with Black Knight, a client.  Email, Dkt. 71-1.  Towards the end of what can only be described as a petty turf war between colleagues, Hantho "replied all" to a message from Gurandiano, inadvertently revealing that Gurandiano had blind copied him on an earlier email in the string.  *Id.*  Abromavage claims that this incident shows Hantho protected Gurandiano because he "did not coach or otherwise discipline" Gurandiano "for blind copying him on an ostensibly private email exchange with a colleague." Pl. 56.1 Stmt. ¶ 394. Abromavage utterly fails to explain why alerting Hantho to the incident through a blind copy (a fairly common practice) violates DBSI policies or is otherwise inappropriate.

Bunzel later wrote an email to Gurandiano, Stabinsky, Abromavage, and two others, copying Hantho, to determine whether the Black Knight turf issues had been resolved and the client meeting was ready to go.  Email, Dkt. 71-3 ("I want to make sure that the FIG and tech teams are synced up across banking and research.").  He also asked Abromavage to coordinate with Gurandiano and one of the other individuals who was copied on the email.  *Id.* Abromavage replied, adding several junior employees to the email chain, and provided an update indicating that he and Stabinsky would be doing the pitch, implying that no one from the tech team would be joining.  *Id.*  Gurandiano then responded, questioning the strategy and listing topics that he believed were beyond the expertise of Abromavage and Stabinsky.  *Id.*  Bunzel then responded that the conversation should be taken off email and that they should "get a call among the right people."  Email, Dkt. 71-2.

The next day, Bunzel reprimanded Abromavage for including junior employees on his initial reply email.  Abromavage Decl. ¶ 13.  Although Abromavage claims Bunzel "did not give any specifics" about what he had done wrong, Bunzel was clear that he was reprimanding Abromavage for copying junior employees on an email that referenced internal turf wars between senior employees.  *Id.*; Pl. 56.1 Stmt. ¶ 404 (Def. Resp.).  Abromavage argues that Bunzel's reprimand of Plaintiff demonstrates that Defendants were protecting Gurandiano.  Abromavage Decl. ¶ 13.  But the fact that Gurandiano exhibited what Bunzel characterized as "very immature and somewhat unprofessional" behavior in his email messages does not mean that Abromavage did not also misstep.  Pl. 56.1 Stmt. ¶ 402 (Def. Resp.).  Even in the light most favorable to Abromavage, nothing from this incident demonstrates that Defendants were protecting Gurandiano.  Bunzel's undisputed testimony was that all involved were at fault and were unable to "collaborate on the basic preparation for a client meeting."  Pl. 56.1 Stmt. ¶ 405 (undisputed).

Abromavage also asserts that Defendants protected Gurandiano after an incident in February 2015 involving the client Social Finance, Inc. ("SoFi").  This incident emerged from yet another turf war.  Over a series of emails, Gurandiano angrily asked who had pitched SoFi a few weeks before, outlined how the pitch book that was used at the meeting had included his team's materials even though his team was not involved, and mentioned that he was planning to alert the compliance department to the issue.  Email, Dkt. 71-4.  Both parties agree that neither Abromavage nor Mortara, his co-head at the time, were present at the SoFi client meeting, knew about it beforehand, or played any role in preparing the pitch book.  Pl. 56.1 Stmt. ¶ 420 (undisputed).  The meeting was instead organized by Steven Valentino, a FIG banker.  Pl. 56.1 Stmt. ¶ 417.

Following his angry emails, Gurandiano's bad behavior escalated. Mortara asserted that in a call between him and Gurandiano, Gurandiano referred to him as "frothing mad" and said that "one of us [seemingly implying Mortara or Abromavage] would be gone next week." Abromavage Decl. ¶ 18. Mortara reported the contents of the call in an email to Hantho. Email, Dkt. 71-5. There also seems to have been an outburst in person, during which Gurandiano confronted Abromavage and Bunzel, used profanity, and raised his voice. Pl. 56.1 Stmt. ¶ 425. Abromavage talked to Hantho about the incident and complained to HR.[28] Abromavage Decl. ¶ 21–23; Pl. 56.1 Stmt. ¶ 462.

As with the Black Knight dispute, Abromavage argues that this incident is evidence of Defendants protecting Gurandiano because "nothing was done to remediate" his conduct[29] and that, instead, "Plaintiff himself was accused of wrongdoing by Gurandiano's protectors." Pl. Resp. at 5. But here too the fact that Abromavage was reprimanded does not mean that Gurandiano got off scot free. Even if Gurandiano's outbursts were completely unacceptable, Abromavage and his team were not faultless. On the day of the incident, Bunzel emailed Mortara, Hantho, and Abromavage to inform them that Gibb would be looking into what happened, but that, putting "aside the Jason issue, Valentino should not be pitching IPOS and putting together presentations without ECM approval or involvement." Email, Dkt. 71-5. Eydenberg agreed with that assessment. At his deposition, Eydenberg testified, "I can't remember in my 25 years of banking too many instances where one industry sector team would want to pitch material with materials from another industry sector team and not go directly to their senior peers. I have virtually never heard of that." Eydenberg Dep., Dkt. 82-3 at 156:25-

---

[28]    This complaint is not protected activity pursuant to Title VII because it did not concern discrimination.

[29]    Abromavage further noted that he was "not aware that anyone took steps to reprimand Gurandiano in any way" as a result of this incident. Abromavage Decl. ¶ 23.

157:7.  Even though the parties agree that Gurandiano's reaction to finding out about the SoFi meeting was disproportionate and offensive, Defendants also had reason to criticize those in FIG.

Moreover, the record shows that Defendants did address Gurandiano's conduct.  Hantho agreed that Gurandiano's behavior was inappropriate, Pl. 56.1 Stmt. ¶ 440 (undisputed), and he testified that he hoped an investigation would take place and that Gurandiano's "manager would properly deal with it."  Def. 56.1 Stmt. ¶ 298 (Pl. Resp.).  That appears to be exactly what happened.  Eydenberg investigated the incident, and he involved both the DBSI executive committee and HR to determine the appropriate response.  Pl. 56.1 Stmt. ¶ 445; Eydenberg Dep. at 183:15-185:24.  Plaintiff provides no evidence or argument why, if Eydenberg was protecting Gurandiano, he would have involved such actors so quickly.[30]  Eydenberg also told Gurandiano to apologize to Valentino and Abromavage, and he engaged in "constant dialogue" with Gurandiano and Gurandiano's immediate supervisor about the incident.  Pl. 56.1 Stmt. ¶ 448 (Def. Resp.).  Moreover, the SoFi encounter seems to be one of the incidents used to justify Gurandiano's termination, further demonstrating that no one protected Gurandiano from the consequences of this bad behavior.  Pl. 56.1 Stmt. ¶ 489.

Abromavage argues that Gurandiano never apologized to him, and he faults Eydenberg for not ensuring that Gurandiano apologized.  Def. 56.1 Stmt. ¶ 303 (Pl. Resp.); Pl. 56.1 Stmt. ¶ 448.  But even if Eydenberg never followed up to confirm that Gurandiano had apologized, no reasonable juror could conclude from this set of facts that DBSI failed to address the incident or that Defendants were protecting Gurandiano.

---

[30]   Eydenberg testified that as a result of the investigation, many at DBSI, including Valentino, who Abromavage does not accuse of retaliation, concluded that Gurandiano's father's recent heart attack was a mitigating factor in this incident.  Eydenberg Dep., Dkt. 82-3 at 188:5-15.

Abromavage also argues that Hantho and Eydenberg attempted to protect Gurandiano during the investigation into Gurandiano's conduct.  Pl. Resp. at 5, n.3.  Hantho allegedly told HR during his interview that Gurandiano was doing much better and that he was supporting him to become a better person.  Pl. 56.1 Stmt. ¶ 486.  With respect to Eydenberg, the notes from his interview indicate that he said that Gurandiano's temper was under control and that he was becoming a better actor.  *Id.* ¶ 487.  But none of these statements demonstrates that Defendants protected Gurandiano during the investigation; they simply reported their experiences.  And importantly, both Hantho and Eydenberg supported terminating Gurandiano's employment once they learned the full extent of his misconduct, including acts that were racist.  Def. 56.1 Stmt. ¶ 91.  In short, here too Abromavage has not adduced evidence that tends to show that Defendants protected Gurandiano.

In the light most favorable to Abromavage, he has shown that Hantho and Eydenberg were friendly with Gurandiano and that, in mid-2015, they thought his behavior was improving.  Abromavage does not explain why those facts tend to prove that they possessed retaliatory animus (particularly inasmuch as it is undisputed that they supported the decision to terminate Gurandiano) or that retaliation was a but-for cause of the adverse employment actions he experienced.  Abromavage's "burden requires him to show more than the possibility of retaliatory animus; he was required to adduce sufficient evidence to permit a reasonable jury to find that 'but for' defendants' retaliatory bias, he would not have [suffered any adverse employment action]."  *Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, 545 F. App'x 23, 25 (2d Cir. 2013).  Abromavage has not met his burden; he is unable to demonstrate that a retaliatory motive was the but-for cause of the adverse employment actions about which he complains.

In short, while Abromavage established a *prima facie* case of retaliation for the seven adverse employment actions, Defendants proffered legitimate and non-retaliatory reasons for all seven.  Abromavage did not demonstrate that Defendants' reasons were pretextual, weak, implausible, inconsistent, or contradictory, and he failed to show that retaliation was a but-for cause of the adverse actions.  Accordingly, the Court grants Defendants' summary judgment motion with respect to Abromavage's Title VII and NYSHRL claims.  Because Abromavage has not established a primary NYSHRL violation, the Court also grants Defendants' motion with respect to the claims that the individual Defendants aided and abetted violations of the NYSHRL.

**II. The Court Dismisses Abromavage's NYCHRL Claims**

Abromavage also alleges that the Defendants retaliated against him in violation of NYCHRL and that the individual Defendants aided and abetted such violations.  Compl. ¶¶ 89–93, 98–102.  NYCHRL retaliation claims are evaluated pursuant to a different legal standard than those brought pursuant to Title VII or NYSHRL.  Accordingly, "NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).  But with only local law claims remaining, the Court declines to exercise subject-matter jurisdiction over them.  Accordingly, these claims are dismissed without prejudice.

**CONCLUSION**

For the reasons discussed above, Defendants' motion for summary judgement is granted as to all of Plaintiff's causes of actions except those based on the NYCHRL, which are dismissed without prejudice.  This case is dismissed.

The Clerk of Court is respectfully directed to close this case.


**SO ORDERED.**

**Date:  March 19, 2021**
      **New York, New York**

                                     **VALERIE CAPRONI**
                                     **United States District Judge**